# Exhibit B

**Exhibit B**

# Roger A. Clark
Police Procedures Consultant, Inc.
10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

July 29, 2011

Arturo J. González, Esq.
Wesley E. Overson, Esq.
Theodore M. Hasse, Esq.
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

*Regarding:*   *Julia Enriquez, et al. v. City of Fresno, et al.*, **USDC Case No. 1:10-CV-00581-AWI-DLB.**

Dear Counsel:

I have reviewed additional information provided to me since submitting my original report dated July 15, 2011.  The additional information I reviewed has not changed my opinions stated in my previous report, and in fact has constituted further evidence that the shooting of Steven Vargas was unjustified and the handling of officer shooting investigations by the Fresno PD is improper.

The following additional opinions are indicated:

A. Sergeant Mike Palomino has fired his gun at another human being in nine officer involved shooting incidents.  In my previous report I stated that he had been in seven shootings.  In my career, I have not encountered a law enforcement officer with so many shootings.

B. Sergeant Palomino has reported that none of his supervisors has ever discussed with him any of his nine shootings, and was offered neither punitive nor non-punitive training following any of his shootings.

C. Sergeant Palomino knows of no instance in which an officer involved in a shooting was disciplined, and as Sergeant Palomino has noted, other officers would hear about it.  This is consistent with the understanding that Sergeant Palomino knew that discipline for shootings does not happen, and that officers in a department do know about shootings and discipline regardless of whether they

find out through official channels.

D. Sergeant Palomino has claimed that he is knowledgeable about PCP, had seen the effects experienced by Mr. Vargas before, believed Mr. Vargas was on PCP, saw Mr. Vargas moving constantly, and that Mr. Vargas was incoherent and oblivious. This is consistent with the fact that, according to Sergeant Palomino's account of the facts, he knew Mr. Vargas would not be able to comply with commands and that Mr. Vargas' erratic movement could be misinterpreted.  Pointing a gun at Mr. Vargas under these circumstances, it would be clear to a properly trained officer, could likely result in tragedy and would not improve his safety or the safety of others.

E. Sergeant Palomino reports his alleged bases for drawing his gun and pointing it at Mr. Vargas: 1) he was told Mr. Vargas tried to break in to a house; 2) he was told Mr. Vargas had a gun; 3) he was told Mr. Vargas was "crazy"; 5) he was told Mr. Vargas was on PCP; and 6) Mr. Vargas was behind the wheel of a motor vehicle. These facts, even if true, do not form a valid basis individually or in their totality for Sergeant Palomino's use of deadly force.

F. A properly designed and operated early warning system would detect a pattern where an officer is involved in nine shootings.  It would also detect a pattern with the other repeat shooters on the Fresno PD.  A system that does not detect such obvious signs of irregularity may be worse than no system at all, because at least with no system there is not the expectation that obvious problems will be caught, potentially leaving administrators less vigilant.

G. The Fresno PD should have provided critical data such as the number of officer shootings an officer had participated in on a regular basis to decision makers in the department regardless of whether some sort of early warning system may exist.

H. Mr. Callanan's characterization that Mr. Vargas was "inside and operating a large red SUV" when Sergeant Palomino approached appears factually inaccurate and seems to be important to his analysis.  (8.00 ¶ 2.)  In fact, the details known indicate that it is not accurate to characterize Mr. Vargas as "operating" his vehicle.

I. Mr. Callanan declares: "By all accounts, the incident was in a critical state **prior to any police intervention**."  (8.00 ¶ 3.) (Emphasis in original.)  However, he fails to indicate what facts or which "accounts" supported this conclusion, and the facts do not conform to this conclusion.  Mr. Callanan also fails to explain what is meant by "critical state," and the import of his having judged the situation to meet whatever criteria he regards as indicating a "critical state."  Contrary to Mr. Callanan's claim, Mr. Vargas was unarmed, immobile in his vehicle, not moving, and apparently incapacitated to some degree.  Mr. Vargas had not exited the

vehicle or communicated with anyone outside the vehicle.  Thus, there was no indication that any situation was escalating in seriousness, or that anyone was actually in danger, or that any violence whatsoever would have occurred had Sergeant Palomino not started shooting.

J.  In the same paragraph, Mr. Callanan states that Sergeant Palomino left his cruiser and "assumed a defensive position on the public sidewalk."  Yet there is no POST training or standards that would advise an officer to walk toward the side of the SUV, standing wide open on the sidewalk, as a way to assume a defensive position.  This characterization does not align with fundamental training that should have been provided to Sergeant Palomino.  (8.00 ¶ 3.)

K.  Numerous other facts seemed to be taken as granted in Mr. Callanan's report that are not clear from the materials available to review concerning the shooting.  For example, the following statements are deficient in lacking a clear indication of the basis for the statement:

   a.  He refers to an "assembled group of civilian witnesses . . . ."  As the witnesses have been identified, this kind of vagueness only serves to obfuscate the facts of the shooting and suggests that Mr. Callanan's assessment is incomplete.  (8.00 ¶ 4.)

   b.  Mr. Callanan asserts that "some observers considered [Mr. Vargas] to be dangerous and under the influence of drugs," however, the source of the assertion that "some"—*i.e.*, two or more—people at the scene believed or expressed this view about dangerousness and drugs, is also not clearly sourced and appears inaccurate.  (8.00 ¶ 4.)  Moreover, these subjective opinions are irrelevant in evaluating Sergeant Palomino's conduct to the extent that they were not communicated to Sergeant Palomino before the shooting.

   c.  "Some observers commented" that Mr. Vargas was "possibly ARMED with a knife or gun."  (8.00 ¶ 4.)  Once again, this vagueness is unnecessary given that the witnesses have been identified.  Furthermore, Mr. Callanan overlooks the key point that what was communicated was what was *possibly* the case, a certain trigger for the obvious follow-up question about what basis there was to believe that was a possibility.

   d.  Arthur Lopez reported, according to Mr. Callanan, that Mr. Vargas "was said to be ARMED."  (8.00 ¶ 4.)  As with "possibly armed," if an officer is told that an individual under these circumstances is said to be armed then there is an obvious way to proceed—ask: "who said?"

   e.  Mr. Callanan characterized the scene as "chaotic," and that it "remained so

as the situation unfolded." (8.00 ¶ 4.) Once again, this claim is not clearly supported and it is unclear what criteria should be applied to determine whether, and to what degree, a scene is "chaotic."

L. Mr. Callanan refers to "loud, clear and understandable VERBAL COMMANDS" made by Sergeant Palomino. (8.00 ¶ 5.) However, Mr. Callanan does not seem to be qualified to determine whether this was the case that the statements made by Sergeant Palomino were understandable. In fact, it appears that it was not clear at all to Mr. Vargas.

M. In the same section, Mr. Callanan mentions that a 911 call was "originally describing a 'home invasion robbery' in progress." In fact, a home invasion robbery was not reported, and the issue is irrelevant since Sergeant Palomino was not aware of what was said on that call in any case.

N. Moreover, Mr. Callanan reports that "[o]n scene civilian witness [sic] reported that the sergeant issued a series of 5 to 6" verbal commands. (8.00 ¶ 5.) This is demonstrably inaccurate from the recording.

O. In section 9.00, Mr. Callanan reaches a series of conclusions without any apparent source as a basis for his praise for the Fresno PD, stating it "is recognized within the professional law enforcement community." By whom within the law enforcement community? Recognized for what? He further states: "It is a significant police and public safety agency and is known to maintain compliance with established professional standards." Again, these conclusions are vague and unsupported. For example, what does it mean to be a "significant police and public safety agency?" How is it "known to maintain compliance with established professional standards?" By whom? These types of opinions are not helpful.

P. Mr. Callanan refers to the shooting of Mr. Vargas as "necessary and effective." (11.00 ¶ 1.) The necessity of shooting Mr. Vargas is not explained by Mr. Callanan and defies the obvious facts. Mr. Vargas was unarmed. Sergeant Palomino claimed he feared Mr. Vargas may be reaching for a weapon. Yet Mr. Vargas had no weapon. How it was "necessary" to shoot Mr. Vargas to death is not explained in Mr. Callanan's report.

Q. Mr. Callanan describes Sergeant Palomino as putting himself "swiftly into a position to contain and control the subject." (11.00 ¶ 4.) As noted above, Sergeant Palomino did not position himself in any manner that would be advised under prevailing police standards. Sergeant Palomino acted swiftly perhaps, but did not assume a position for containment and control.

R. Finally, with regard to Mr. Callanan's report, he asserts that any officer "would have good cause to believe that an effective and reasonable use of force was

authorized to effectuate the subject's arrest, prevent the subject's further escape, and overcome the subject's demonstrated resistance." (11.00 ¶ 6.) This statement is remarkable in its presumptions. First, it assumes there was a basis for arrest prior to pointing his gun at Mr. Vargas, that there was some risk of escape, that there was a basis for using deadly force even if there was a risk of escape, and that Mr. Vargas was somehow resisting. Mr. Callanan fails to provide a useful opinion in this regard as no basis is provided to justify these fundamental assumptions. Moreover, this approach flies in the face of POST standards, where it is noted that deadly force should be "the last resort used in the direst circumstances," and should be guided by a "reverence for human life." (POST Learning Domain #20: "Use of Force," page 3.)

S. Mr. Paul Myron's report provides little, if any, guidance on evaluating the Fresno PD's internal affairs unit's "administrative investigations" in the context of the allegations of this litigation. For example, Mr. Myron opines at length on the formatting of the IA memoranda, expressing his "favorable impress[ion]" of the memoranda formatting. This does not provide guidance on how the investigations are being conducted and the impact of the multi-year delays in completing the investigations.

T. Mr. Myron briefly addresses the problem of how the average IA investigation takes years to complete for officer shooting investigations. (Page 4, Sec. F.) His conclusions in this regard appear totally unsupported:

   a. "Most police chiefs want this report in a timely manner, but are hesitant to demand completion of the IA report until all supporting documents and relevant information have been compiled." How Mr. Myron has been able to determine what "most police chiefs" want regarding IA investigations, and what they hesitate to do regarding demanding complete reports, is totally unexplained and has no apparent basis. Furthermore, this opinion does not appear to provide any guidance in evaluating the actions of the Fresno PD. The unlikely claim that Mr. Myron knows what "most police chiefs" want does not answer the question of what a police chief properly *should* do when their IA investigations into officer shootings are delayed for years.

   b. Mr. Myron conveys the belief that IA investigation delays might be caused by delays from other agencies. The source of his belief is not explained. To the extent that this is simply what Mr. Myron was told by his client, and he now puts it into his report, this is not information that reflects any expert judgment. Moreover, it does not answer whether reports from other agencies *should* be allowed to delay IA investigations for the amount of time Fresno PD investigations are delayed.

    c. Finally, in this section, Mr. Myron offers up the following legal opinion: "Government Code Section 3304 allows the Chief of Police broad discretion by tolling the time for completion of the IA report while the criminal investigation is on-going." The basis for Mr. Myron's interpretation of the California statute he cites is not provided and is not apparent from his specific areas of expertise. This is not a helpful opinion. It should also be noted, though, that Mr. Myron seems to view the statute he cites as providing Chief Dyer "broad discretion" since the one year deadline, according to the opinion of the attorney advising Mr. Myron, can be extended when a criminal investigation is "on-going." The import of that "broad discretion" is unclear. Is this the best practice according to Mr. Myron? This section of Mr. Myron's opinion seems to, at best, try to excuse the conduct of the Fresno PD rather than explain what Mr. Myron's expert opinion is regarding the practice of leaving open officer shooting investigations for years, regardless of whether there is a statutory basis for doing it with limited consequences.

U. I also want to briefly address the "Gang Information Report" document provided by Defendants. Simply put, the information in the report is irrelevant to evaluating the shooting of Steven Vargas since Sergeant Palomino had no information about Steven Vargas before the shooting.

V. Lastly, I would emphasize several points that have come to light regarding the CALEA accreditation process.

    a. It appears that CALEA is unable to reliably verify the Fresno PD's claims about its compliance with required policies based upon their system for soliciting "proofs" of compliance. CALEA essentially has to rely on unsworn representations by the Fresno PD in assessing whether the Fresno PD is doing what it claims to be doing regarding its policies.

    b. It also appears that the Fresno PD has not disclosed key facts to CALEA about its failures related to pushing repeat shooters back on the street with little oversight, allowing IA investigations into officer shootings to last for well more than three years on average, and other issues in this litigation.

## ADDITIONAL MATERIAL CONSIDERED

1. Defendants' Disclosure of Expert Testimony and Attached Reports.

2. Expert Report of Durand Begault, Ph.D.

3. Documents Produced on July 28, 2011 – Memoranda, reports, policies, and other

documents related to CALEA and the CALEA accreditation process.

4. Parties' Stipulated Facts Regarding J. Enriquez Interrogatory No. 11.

5. Defendants' Motion for Summary Judgment and declarations & attachments.

6. Rough Transcript of Deposition of Sergeant Mike Palomino.

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 29, 2011.

_____
Roger A. Clark