1

2

3

4

5

6

7                IN THE UNITED STATES DISTRICT COURT FOR THE

8                        EASTERN DISTRICT OF CALIFORNIA

9

10    JULIA DIANE ENRIQUEZ, individually )   CV F 10 - 0581 AWI DLB
      and as successor-in-interest to STEVEN )
11    ANTHONY VARGAS, Deceased; JANE )
      CARLOS VARGAS; AMADO VARGAS; )       ORDER DEFENDANT'S
12    STEVEN ANTHONY VARGAS, JR.        )   MOTION FOR SUMMARY
      minor through his guardian *ad litem*, )  JUDGMENT OR SUMMARY
13    JULIA DIANE ENRIQUEZ); ANGELO )        ADJUDICATION
      ALECZANDER VARGAS (a minor    )
14    through his guardian *ad litem*, JULIA )
      DIANE ENRIQUEZ); JOSE BLAS     )
15    FIGUEROA, JR. (a minor through his )
      guardian *ad litem*, JULIA DIANE  )
16    ENRIQUEZ); HAILEY ROSE          )
      FIGUEROA (a minor through her   )
17    guardian *ad litem*, JULIA DIANE  )
      ENRIQUEZ); and LEAH REALYNN )
18    GORTEZ-ENRIQUEZ (a minor through )
      his guardian *ad litem*, JULIA DIANE )
19    ENRIQUEZ),                      )
                       Plaintiffs,    )
20                                    )
             v.                       )
21                                    )
      CITY OF FRESNO, a municipal     )   Doc. # 88
22    corporation; JERRY DYER, individually )
      and in his capacity as a Chief of Police of )
23    the CITY OF FRESNO; MIKE        )
      PALOMINO,  individually and in his )
24    capacity as a police officer of the CITY )
      OF FRESNO),                     )
25                                    )
                       Defendants.    )
26    _____ )

27

28

1    This is an action for wrongful death and infringement of rights under the Fourth and

2    Fourteenth Amendments to the United States Constitution.  The action arises out of the

3    shooting death of decedent Steven Anthony Vargas ("Decedent") by Fresno City Police

4    Officer Mike Palomino ("Palomino") during the course and scope of Palomino's

5    employment.  The action is brought by Julia Diane Enriquez as successor in interest to

6    Decedent and as guardian ad litem for Decedent's minor children.  Plaintiffs' currently-

7    operative Second Amended Complaint ("SAC") alleges claims pursuant to 42 U.S.C. § 1983

8    against Palomino in his individual and official capacity, against Fresno Police Chief Jerry

9    Dyer ("Dyer") in his individual and official capacities and against the City of Fresno.

10   Currently before the court is a motion for summary judgment or summary adjudication by all

11   Defendants.  Federal subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331.  Venue

12   is proper in this court.

**DEFENDANTS' UNDISPUTED MATERIAL FACTS**

14   Defendants' proffer of undisputed material facts ("UMF's") can be divided into two

15   general categories; in the first category are proffered facts relating to events directly leading

16   to, during, and directly following, Palomino's shooting of Decedent; second are facts relating

17   to the culture of the Fresno Police Department and, in particular, to its culture and practices

18   relating to the use of deadly force.  The court will consider the two sets of facts separately.

19   **I. Facts Pertaining to the Shooting of Decedent by Palomino**

20   Defendants' proffered UMF's regarding the shooting of Decedent by Palomino are

21   relatively fewer in number and although they are mostly disputed in some particular, it is

22   possible to derive from the facts a picture of what took place that is sufficiently established

23   for the purpose of analysis of Defendants' motion for summary judgment with regard to

24   Palomino.

25   It is not disputed that at 2:50 p.m. on October 27, 2009, a bystander named Aurelio

26   Santiago ("Santiago") flagged down Palomino, who was driving in his police car westbound

27   on McKinley Avenue just west of Cedar Avenue.  Santiago summoned Palomino to the

28   property located at 4021 E. McKinley.  Santiago had been driving a blue van on McKinley

2

and had witnessed a red Suburban swerve left across traffic and onto the sidewalk on the left side of the street where it swerved on and off the sidewalk until it rolled across the lawn at 2021 E. McKinley and came to a stop against a car in the driveway.  When Palomino arrived in his police car, there is no dispute that Santiago told Palomino that he (Santiago) had been informed that Decedent was high on the drug phencyclidine, here referred to as "PCP" or "JK".  It is also not disputed that Santiago informed Palomino that Decedent might have a gun and/or weapon.  See Deposition of Aurelio Santiago, exhibit 15 to Doc. # 98 (Santiago informs Palomino Decedent "might have a gun" and later said Decedent "might have a weapon").

Although there is some dispute as to the proximity of other persons to the events alleged, there is no dispute that Santiago was standing approximately five feet from Palomino and had an unobstructed view of the interaction between Palomino and Decedent.  There is also no dispute that there were other persons in the vicinity.  Some were apparently behind Santiago's van which an aerial photograph shows is parked on the street and slightly past the fence line that divides the subject property from the house next door.  A woman who resides at 2021 E. McKinley was apparently in the house along with some other persons.  Although Plaintiffs dispute Defendants' use of the term "commotion" to describe the scene at the time Palomino arrived, and although there is some dispute as to whether the term "hysterical" properly describes the mental state of the woman resident at the address, the court finds the application of both terms is not substantially inaccurate in view of all the evidence submitted.

Plaintiffs deny Defendants' allegation that Decedent was under the influence of phencyclidine (hereinafter "PCP") at the time of the encounter with Palomino.  There appears to be no substantial basis for the denial.  An analysis of Decedent's blood following the shooting showed 221 ng/ml of PCP and indicated that blood levels in excess of 90 ng/ml are toxic.  The court also finds that the accounts of both Palomino and Santiago that stated that Decedent appeared to be "out of it" or disconnected and unaware of his surroundings is consistent with the toxicological analysis.  The court concludes that there is undisputed evidence that Decedent was substantially mentally impaired owing to the presence of a toxic

1    amount of PCP in his blood.

2        There is no dispute that Palomino ordered Decedent to "show his hands" on at least

3    three occasions and that Decedent did not comply.  While Defendants do not allege whether

4    the window to Decedent's car was up or down at the time of the shooting, it does appear to be

5    Plaintiffs' contention that Defendants have not shown that Decedent would have been able to

6    hear Palomino's commands to "show his hands."  To the extent that the issue is material to

7    Plaintiffs' claims, the court finds that the opinion testimony by Plaintiff's forensic acoustic

8    expert is sufficient to raise an issue of material fact as to whether or not Decedent could

9    effectively hear the command to show his hands notwithstanding his chemically impaired

10   state.  In this regard the court notes that the photograph submitted as Exhibit A to the

11   Declaration of Michael Palomino appears to indicate that Palomino was standing on the

12   passenger side of Decedent's vehicle looking through the front-seat passenger side window at

13   Decedent at the time of the shooting.  Doc. # 88-1.  It is also evident that Palomino fired the

14   first volley of shots through the front passenger side window which appears shattered in the

15   photograph.

16       According to Palomino's Deposition, Palomino was able to look through the clear

17   glass of the passenger side window and see Decedent seated and belted behind the steering

18   wheel of the Suburban.  In his deposition, Palomino states that as he observed Decedent,

19   Decedent appeared to be "writhing around" and incoherent.  Palomino testified that after he

20   had repeatedly commanded Decedent to "show his hands," Decedent placed both his hands

21   on the steering wheel and deliberately turned his head and looked at Palomino.  Palomino

22   Dec. at 85-87.  After Palomino commanded "let me see your hands" for the final time,

23   Decedent took his hands off the steering wheel and bent down toward the floor of the car as if

24   reaching for something.  It is not disputed that at this point Palomino fired the first volley of

25   shots through the passenger-side front window of the car at Decedent.  Whatever the

26   condition of Decedent was after the first volley of shots, it is not disputed that Decedent

27   never came back to a sitting position and that his hands never came into Palomino's view.

28       Palomino's testimony is somewhat vague as to the number of shots that were fired,

4

however it is not disputed that Palomino fired at least two volleys of three or more shots each then reloaded his handgun and proceeded to fire additional shots. The SAC alleges Decedent was struck by bullets nine times. Decedent was pronounced dead after transportation to a local hospital.

The court notes that the deposition testimony of both Palomino and Santiago supports the facts recited above. The court finds these facts are not disputed.

**II. Facts Pertaining to Motions for Summary Judgment as to Dyer and City of Fresno**

Defendants proffer a total of 28 UMF's to support their motion for summary judgment as to Defendants Dyer and the City of Fresno. The first six of the proffered UMF's (UMF #'s 22 through 28) concern the standards established by Peace Officer Standards and Training ("POST"), which the parties agree are an authoritative set of standards for police training and conduct. Defendants assert that Fresno Police Department (hereinafter, "Department") operates in compliance with those standards. UMF #'s 22 through 28 are taken from the declaration of Robert Nevarez, Deputy Chief of Police.

UMF's numbered 29 through 34 are concerned primarily with the involvement of Defendant Dyer in the investigation of, and policies surrounding, officer involved shootings. Defendant Dyer denies that Department has had at any time relevant to this action any policy, custom or practice of permitting unlawful searches or seizures, permitting shootings by officers of innocent persons or the application of excessive force or permitting any deficiency in required training or supervision. Of some significance to the instant motion for summary judgment, Defendants allege that "it is the practice of the [Department] to wait for the Fresno County District Attorney's office to conclude their criminal investigation into all officer involved shootings prior to concluding their own internal affairs investigation." Doc. # 103-1 at ¶ 32. It appears to be conceded by Defendants that, as a result of the policy of waiting for the completion of the DA's investigation, the mean time for resolution of the internal affairs investigation is typically on the order of years, rather than months. Neither party appears to offer any measure of the mean or median time to closure for an internal affairs investigation of an officer involved shooting.

5

Defendants' UMF's numbered 35 through 44 pertain to the accreditation of Department through the Commission on Accreditation for Law Enforcement Agencies ("CALEA"), "an international accreditation agency that delineates best practice for law enforcement agencies and ensures that agencies seeking accreditation have adopted written directives and that their members conduct is consistent with their written directives." Doc # 103-1 at ¶ 36.  As with Defendants' proffer of facts regarding POST certification, Defendants' proffered UMF's show CALEA accreditation requires that certain policies be in place and that the agency be able to demonstrate procedures that assure compliance with those policies.  Department was CALEA certified at the times pertinent to this action.

Of some significance to Plaintiffs' SAC, Defendants proffer the following UMF's at paragraphs 45 and 46 of Document 103-1 to address the issue of Departmental review of internal affairs investigations:

> CLEA standards require the Fresno Police Department to have a written directive regarding the time period to complete an internal affairs investigation that allows for extensions and to prove compliance with that directive.  At all relevant times the Fresno Police Department was CALEA accredited with regard to the time period for completing internal affairs investigations.

> During the April 2011 assessment, the public expressed concerns that the Fresno Police Department had a high rate of officer involved shootings and that investigations into those incidents remained open for extensive time periods and the department addressed those concerns.

The remainder of Defendants' UMF's assert that Department's policy with regard to self-defense and use of force is "consistent with state and federal law as well as modern law enforcement standards and POST guidelines.  Doc. 130-1 at ¶ 47.  The remainder of Defendants' UMF's (UMF's numbered 48 through 51) state that Department officers report instances of use of force in the conduct of their official duties and that the Department timely reviews, and conducts thorough investigations into, officer involved shooting incidents.  Id. at ¶¶ 48-49.  Defendants further assert that all officers operate under a functioning chain of command and that procedures are in place to identify officers who "may have issues that could potentially interfere with their duties."  Id. at ¶¶ 48, 51.

Plaintiff dispute essentially all of Defendants' proffered UMF's, particularly those

6

that suggest that Departmental policies and procedures are in accord with nationally recognized standards for conduct.  In essence, Plaintiff's assert that the fact that Department has experienced a higher-than-expected rate of officer involved shootings, particularly shootings of unarmed suspects, effectively contradicts Defendants' assertion that Fresno Police conduct conforms with legal and agency standards.  In other words, Plaintiffs assert that there is a disconnect between what Department purports to establish as practice based on official policies and procedures and what actually happens as evidenced by the high rate of officer-involved shootings.  Plaintiffs offer evidence to show that the period between the time of an officer involved shooting and the time the internal investigation of that shooting is concluded is unduly and atypically prolonged so that effective corrective measures, if warranted would not be possible.  Plaintiffs also allege that, according to review by their own police practices expert, a total of 19 of the 51 officer involved shootings that occurred during the period between 2005 and 2010 reflected unreasonable use of force and that in none of those instances were corrective measures taken.  Defendants argue that only one of the alleged improper officer involved shootings actually reflected improper use of force and that the officer involved was terminated.

## LEGAL STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Although the party moving for summary judgment always has the initial responsibility of informing the court of the basis for its

motion, the nature of the responsibility varies "depending on whether the legal issues are ones on which the movant or the non-movant would bear the burden of proof at trial." Cecala v. Newman, 532 F.Supp.2d 1118, 1132-1133 (D. Ariz. 2007). A party that does not have the ultimate burden of persuasion at trial – usually but not always the defendant – "has both the initial burden of production and the ultimate burden of persuasion on the motion for summary judgment." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

## DISCUSSION

**I. Plaintiff's Claim for Violation of Decedent's Rights Under the Fourth Amendment**

### *A. Substantive Violation of Decedents' Fourth Amendment Rights*

A seizure is a "governmental termination of freedom of movement through means intentionally applied," Jensen v. City of Oxnard, 145 F.3d 1078, 1083 (9th Cir.1998) (internal quotation marks and citation omitted), and occurs "whenever [an officer] restrains the individual's freedom to walk away." Robins v. Harum, 773 F.2d 1004, 1009 (9th Cir.1985). An intentional shooting by a police officer constitutes a seizure for purposes of the Fourth Amendment. Jensen, 145 F.3d at 1078. "To determine if a Fourth Amendment violation has occurred, we must balance the extent of the intrusion in the individual's Fourth Amendment rights against the government's interests to determine whether the officer's

conduct was objectively reasonable based on the totality of the circumstances. [Citation.]"
Espinosa v. City and County of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010) (citing
Graham v. Connor, 490 U.S. 386, 396-397 (1989).  "An objectively unreasonable use of
force is constitutionally excessive and violates the Fourth Amendment's prohibition against
unreasonable seizures."  Torres v. City of Madera, 648 F.3d 1119, 1123-1124 (9th Cir. 2011).
"Law enforcement officers may not shoot to kill unless, at a minimum, the suspect presents
an immediate threat to the officer or others, or is fleeing and his escape will result in a serious
threat of injury to persons."  Harris v. Roderick, 126 F.3d 1189, 1201 (9th Cir. 1997).

       A court analyzes of the reasonableness to the force employed in police seizure
according to the factors set forth by the Supreme Court in Graham. The Graham, Court
employed  "a non-exhaustive list of factors" which include "(1) the severity of the crime at
issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others;
and (3) whether the suspect actively resists detention or attempts to escape."  Liston v.
County of Riverside, 120 F.3d 965, 976 (9th Cir. 1997) (citing Graham, 490 U.S. at 388).
Both parties center their arguments on what is the central issue in this case – whether
Decedent presented an immediate threat to Palomino's safety or the safety of the bystanders.
See Shannon v. City of Costa Mesa, 46 F.3d 1145, 1995 WL 45723 (9th Cir. 1995) at *4 (the
most important element in an excessive force claim is whether the suspect poses an
immediate threat to the safety of the officers or others).

       Defendants point to the following facts to support their contention that Palomino
reasonably believed that Decedent posed an immediate threat to the lives or well-being of
himself and/or the bystanders: (1) the scene onto which Palomino arrived was "chaotic." (2)
Palomino reasonably believed Decedent was armed based on remarks made by Santiago; (3)
Palomino reasonably believed Decedent was chemically impaired by PCP and saw
indications of impairment and so was reasonable in his belief that Decedent was
unpredictably prone to violent behavior; (4) Palomino reasonably believed Decedent was
dangerous to others because the car engine was still running and Decedent could have moved
the car in a way that would threaten others; and (5) Decedent refused to keep his hands in

10

view but bent down taking his hands off the steering wheel and out of Palomino's sight.

Plaintiffs dispute Defendants' version of the facts in several particulars. First, Plaintiff's allege that evidence exists in the form of an examination of the recording made by Santiago to the 9-1-1 dispatcher by Plaintiff's expert forensic acoustical expert that indicates the absence of any time during the recording where anyone informed Palomino that Decedent was armed. Plaintiffs also dispute whether Decedent "disobeyed" Palomino's order to show his hands given that the window of Decedent's van was rolled up and there is witness testimony that the radio in the van was playing loudly. Further, Plaintiff's contend that, although there was individual evidence to indicate Decedent was intoxicated or chemically impaired, there was no visual evidence to indicate that Decedent was behaving in a hostile manner.

As reflected in the legal standard for summary judgment, the non-moving party need only raise an issue of material fact that requires resolution by the finder of fact to defeat summary judgment. Anderson, 477 U.S. 248-49. Proof of the material fact is not required. First Nat'l Bank, 391 U.S. at 290. At the outset, one fact stands out as paramount from the court's point of view, although neither party seems to dwell on it; Palomino never actually saw anything in Decedent's hands. Defendants do not cite, and the court has not found, any authoritative source for the proposition that application of lethal force may be justified where there is no observable evidence that the decedent is in actual possession of a weapon. In Curnow v. Ridgecrest Police, 952 F.2d 321 (9th Cir. 1991), the Ninth Circuit affirmed a district court's refusal to grant qualified immunity where police, according to the plaintiff's proffer of evidence, saw the decedent holding a gun but not pointing it at anyone. Id. at 323. The Ninth Circuit reasoned that under the plaintiff's version of the facts "the police officers could not reasonably believe that the use of deadly force was lawful because [the decedent] did not point the gun at the officers and was apparently not facing them when they shot [decedent ]the first time." Id. at 325.

From an objective point of view the situation that Palomino faced evinced a *potential* for violence or the threat of violence, but there is little or no objective indication that the

potential would necessarily ripen into an actual immediate threat to the lives of anyone present.  Even assuming that Palomino had an adequate view of what Decedent was doing, a fact Plaintiffs' dispute, there is nothing in the undisputed facts to differentiate whether it was more or less likely that Decedent was reaching toward the floor for a gun, a wallet or something else.  A fact that Defendants point to is their contention that the scene was "chaotic."  While the court does not wish to quibble with characterizations, it is notable that: (1) there is no evidence that notwithstanding the fact the woman who resided at the address was emotionally stressed, Palomino lacked the ability to direct and receive bystander cooperation, and (2) there is a legitimate expectation that an objectively reasonable officer will rise above the "chaos" to reach a reasoned assessment of the situation.  The court also notes there is little evidence that the situation was "rapidly evolving" as that term is used to describe cases where there is suspect flight, hostage taking or similar emergent situations.

It is also significant that there is no evidence to suggest that Palomino warned Decedent that Palomino would use deadly force or that such warning would be infeasible. See Jensen v. City of Oxnard, 145 F.3d 1078, 1086 (9th Cir. 1988).  In addition, Defendants' contention that there is no constitutional significance to the number of shots Palomino fired is not necessarily correct.  See Hopkins v. Andaya, 958 F.2d 881, 886 (9th Cir. 1992) (issue of material fact remained where officer fired several shots at assailant, achieving separation between himself and attacker, and defense did not show that lesser force could not have been deployed when attacker again advanced against officer).  In the instant case, Defendants' observation that first volley of shots did not appear to affect Decedent is ambiguous given the fact that Decedent was bent down at the time.  In this context it is not clear what "no effect" means.  Without more information the court cannot conclude that the second volley of shots did not amount to excessive use of force.

Addressing the remainder of the Graham factors, the court finds neither bends the analysis conclusively one way or the other.  Defendants contend that Palomino had reason to believe Decedent was involved in a violent crime, however all that was apparent at the time were facts to indicate Decedent was intoxicated and may have been attempting to operate a

motor vehicle while intoxicated. While such observations may indicate the commission of a crime that may be technically termed violent, there is little Decedent's behavior to indicate an intent to cause harm to others as he sat in his car. Similarly, there is nothing in the facts to indicate that Decedent had, or was contemplating flight to avoid apprehension.

It is well established "that in police misconduct cases, summary judgment should be granted only 'sparingly' because such cases often turn on credibility determinations by a jury." Espinosa, 598 F3d at 537. In this case, credibility determinations come into play in the issues of whether Palomino had adequate reason to believe that Decedent was probably armed, whether Decedent could hear Palomino's commands to "show his hands," and whether Palomino had an adequate view of what Decedent was doing to conclude that he was probably reaching for a gun. To put the matter another way, the court finds that if it is to be sparing in its willingness to grant summary judgment, then this case is one which clearly presents credibility issues that clearly require a jury's determination.

The court finds Defendants have not satisfied their burden to show that there remains no issue of material fact to indicate that Decedent suffered in infringement of his Fourth Amendment rights against the unreasonable application of force.

### B. Qualified Immunity

To determine whether qualified immunity applies, the threshold question is whether , in the light most favorable to the party asserting injury, the facts show an officer's conduct violated a constitutional right. Saucier [v. Katz, 533 U.S. 194, 201 (2001)]; Robinson v. Solano County, 278 F.3d 1007, 1012 (9th Cir. 2002) (en banc). If no constitutional right was violated, immunity attaches and the inquiry ends. Saucier, 533 U.S. at 201. If a constitutional right would have been violated were a plaintiff's allegations established, the next step is to ask whether the right was clearly established in light of the context of the case. Id. Finally, the contours of the right must be clear enough that a reasonable officer would understand whether this or her acts violate that right. Id. at 202.

"The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the *legal constraints* on particular police conduct. It is sometimes difficult for

13

an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a *mistaken understanding as to whether a particular amount of force is legal in those circumstances*.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." Saucier, 533 U.S. at 205 (italics added).  For purposes of determining whether an officer is entitled to qualified immunity under the second prong of Saucier, the court assumes the officer "'correctly perceived all the relevant facts' and ask whether [the] officer could have reasonably believed at the time that the force actually used was lawful under the circumstances." Torres v. City of Madera, 648 F.3d 1119, 1127 (9th Cir. 2011).

Defendants' argument regarding qualified immunity is confined to the assertion that Decedent did not suffer any constitutional violation and there is no issue of material *fact* as to whether there was any such violation.  Thus, Defendants address only the first prong of the Saucier analysis.  Since the court has concluded that there does remain an issue of material fact as to whether Decedent suffered an infringement of his rights against excessive force under the Fourth Amendment, it follows that Defendants' argument with regard to qualified immunity is without merit as far as it goes.  With regard to the assertion of qualified immunity, it is Defendants' burden to supply some foundation for the existence of a *legal* uncertainty as to lawfulness of the application of lethal force in order to carry the second prong of the analysis.  It is not up to the court to provide argument where Defendants have provided none.  The court therefore finds Defendants are not entitled to qualified immunity.

### *C.  Entity Liability*

A municipal entity is liable only for the actions of "its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Monell v. Dep't of Soc. Services, 436 U.S. 658, 694 (1978).  "To hold a local government liable for an official's conduct, a plaintiff must first establish that the official (1) had final policymaking authority 'concerning the action alleged to have caused the particular constitutional or statutory violation at issue' and (2) was the policymaker for the local governing body for the purposes

14

of the particular act." Weiner v. San Diego County, 210 F.3d 1025, 1028 (9th Cir.2000)

(quoting McMillian, 520 U.S. at 785, 117 S.Ct. 1734). "A municipality is not liable for the

random acts or isolated incidents of unconstitutional action by a non-policymaking employee.

[Citations.]" Sepatis v. City and County of San Francisco, 217 F.Supp.2d 992, 1005 (N.D.

Cal. 2002). "Rather, to impose municipal liability for a violation of constitutional rights, a

plaintiff must show: (1) that plaintiff was deprived of a constitutional right; (2) that the

municipality had a policy; (3) that this policy amounted to deliberate indifference of

plaintiff's constitutional rights; and (4) that the policy was the moving force behind the

constitutional violation." Id. (citing Plumeau v. Sch. Dist. #40 County of Yamhill, 130 F.3d

432, 438 (9th Cir. 1997).

Case authority in this circuit has broadened the meaning of "policy" such that a

plaintiff may establish municipal liability "by demonstrating that (1) the constitutional tort

was the result of a 'longstanding practice or custom which constitutes the standard operating

procedure of the local government entity;' (2) the tortfeasor was an official whose acts fairly

represent official policy such that the challenged action constituted official policy; or (3) an

official with final policy-making authority 'delegated that authority to, or ratified the decision

of, a subordinate.' [Citation]" Price v. Sery, 513 F.3d 962, 966 (9th Cir. 2008) (quoting

Ulrich v. City & County of San Francisco, 308 F.3d 968, 984-985 (9th Cir. 2002). Further, a

policy "may be inferred from widespread practices or 'evidence of repeated constitutional

violations for which the errant municipal officers were not discharged or reprimanded.'"

Nadell v. Las Vegas Metro. Police Dept., 268 F.3d 924, 929 (9th Cir. 2001) (quoting Gillette

v. Delmore, 979 F.2d 1342, 1349 (9th Cir. 1992). "A plaintiff need not show that a

municipality affirmatively encouraged officers to take the lives of citizens; rather a

municipality may be liable under Section 1983 for constitutional injuries inflicted by its

officers if it fails to adequately guard against such injuries through training and supervision."

Perrin v. Gentner, 177 F.Supp.2d 1115, 1123 (D. Nev. 2001). "A municipality will be held to

a 'constructive notice' standard for failing to take corrective measures where information

about officer misconduct plainly indicates a need for such measures." Id.

15

1    The factual ground for Defendants' argument for summary judgment on the issue of

2    municipal liability rests principally on the facts of Department's certification under both

3    POST and CALEA and the fact that Departmental officers are guided by both training and

4    written policies that follow the requirements of both agencies.  Plaintiffs' argument in

5    opposition to summary judgment rests on three facts that suggest that the actual experience of

6    Department officers is significantly out of line with what policy and training would suggest.

7    First, Plaintiffs' expert witness, Roger Clark, surveyed all listed officer-involved shootings

8    between 2005 and 2010 and determined that the raw number of shootings (51) were

9    significantly higher than experienced in comparably sized municipalities (San Jose (16) and

10   Sacramento (17)), and that a significant number of the shootings by Department (19) were

11   "unjustified." Exh. A to Declaration of Roger A. Clark (hereinafter, "Clark Report") at 21.

12   Plaintiffs also assert that internal investigations of officer-involved shootings are

13   unreasonably delayed so that any determination of officer culpability, if found, would usually

14   be returned well after the period of time during which effective corrective action can be

15   taken.  See generally, Deposition of Paul Myron, Exh. 5 to Hasse Declaration, Doc. # 98;

16   Clark Report at 19.  Third, Plaintiffs' expert witness, Roger Clark, reviewed Departmental

17   records of each of the 19 officer involved shootings that were determined by him to reflect

18   excessive use of force and determined that on disciplinary action or retraining had occurred in

19   any of the instances identified.

20   Defendants dispute Plaintiffs' characterizations of the status of officer involved

21   shootings as expressed in the Clark Report.  Defendants allege that one officer involved

22   shooting resulted in the termination of the officer and that investigation of four of the

23   remaining eighteen shootings were found to be within departmental policy by the Fresno

24   district attorney.  Defendants allege that investigation of the remaining instances is not

25   complete at this time.  Defendants also object Plaintiffs' characterization of the length of time

26   to the completion of the investigation of an officer involved shooting as being unduly

27   prolonged.  Defendants allege that the policy of not concluding internal affairs investigation

28   until after criminal investigation by the District Attorney significantly prolongs the

16

investigative process but serves the purpose of assuring independent evaluation of officer involved shootings.  Defendants contend that the limitations period on officer disciplinary actions is "tolled" during the pendency of the criminal investigation.

Plaintiffs contend the evidence they have offered is sufficient to show there remains an issue of material fact with regard to entity liability on the theories of failure to investigate and discipline, failure to monitor or supervise, failure to train and ratification.  The court agrees that Plaintiffs have presented factual allegations, backed by evidence, in their opposition that are sufficient to raise an issue of material fact with regard to municipal liability. In their reply, Defendants vigorously dispute the facts and characterizations put forward by Plaintiffs but the court finds that Defendants opposition does not rise to the level of effectively negating the evidence and contentions put forward by Plaintiffs.  The court concludes the evidence indicating a policy leading to constitutional infringement of Decedent's Fourth Amendment rights exists in the form of a historical record that suggests uncorrected occurrences of such violations in the past and a failure of Department to institute safeguards against such violations.  The court recognizes that such evidence is vigorously disputed, but the court does not find that the facts asserted by Defendants are insufficient to establish that there is no remaining issue of material fact for a jury to determine.  Summary judgment will therefore not be granted with regard to municipality liability as to Plaintiffs' first claim for relief.

### D.  Plaintiff's Personal Capacity Claims Under Section 1983 Against Dyer

The Ninth Circuit "has long permitted plaintiffs to hold supervisors individually liable in § 1983 cases when culpable action, or inaction, is directly attributed to them."  Starr v. Baca, 652 F.3d 1202, 1205 (9th Cir. 2011).

> In Larez v. City of Los Angeles, 946 F.2d 630 (9th Cir. 1991), we explained that to be held liable the supervisor need not be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury.'  Id.. at 645.  Rather, the supervisor's participation could include his "own culpable action or inaction in the training, supervision, or control of his subordinates," "his acquiescense in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others."  Id. at 646 (internal citations, quotation marks, and alterations omitted).

17

1    Starr, 652 F.3d at 1205-1206.

2        The core reason this court has declined to grant Defendants' motion for summary

3    judgment as to municipal liability is that it is the court's finding that there remain issues of

4    material fact as to: (1) whether some or any of the 19 officer involved shootings that are

5    alleged by Plaintiffs to have been unlawful are, in fact, unlawful; (2) whether there has been

6    an unreasonable delay in the Department's determination of the justification or lack of

7    justification for the 19 officer involved shootings, and (3) whether any officers who

8    participated in officer involved shootings were improperly not investigated or were

9    investigated and improperly exonerated, or were investigated and found to be culpable at

10   some level but were not subject to corrective action.  There is no dispute that Dyer was the

11   administrative driving force behind policies and practices that determined both the timeliness

12   of investigation of officer involved shootings and the application or lack of application of

13   corrective measures should any have been required.  Thus, to the extent there remains one or

14   more issues of material fact as to items 2 and 3 listed above, summary judgment as to Dyer is

15   not appropriate.  Summary Judgment will be denied as to Chief Dyer without prejudice.

16   **II. Plaintiffs' Fourteenth Amendment Claim**

17       Although Plaintiffs' second claim for relief nominally alleges violation of Plaintiffs'

18   Fourteenth Amendment rights against all Defendants, it is clear from the text of the pleading

19   that the primary focus of Plaintiffs' claim is against Department and Chief Dyer (not

20   Palomino) for deliberate indifference or reckless disregard of *Plaintiffs'* (not Decedent's)

21   substantive due process rights to familial companionship as evidenced by Department's

22   failure to recognize and take action to correct the tendency of Departmental officer to use

23   unreasonable force.  Specifically, Plaintiffs' SAC alleges:

24       The [D]efendants' conduct violated [Plaintiffs' Fourteenth Amendment rights
         in at least the following ways: the killing of [Decedent] violated the liberty
25       interest of Julia Enriquez in the companionship and support of her husband;
         Jane Carlos Vargas and Amando Vargas in the companionship and support of
26       their son; Steven Anthony Vargas, Jr, and Angelo Aleczander Vargas in the
         companionship and support of their father; and Jose Blas Figueroa, Jr., Hailey
27       Rose Figueroa and Leah Realynn Gortarez-Enriquez in the companionship and
         support of their stepfather.
28

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> These above-stated violations of the [P]laintiffs' constitutional rights occurred as the result of the deliberate, reckless, and malicious acts, omissions, and practices of Defendants City of Fresno and Chief Dyer in at least the following ways: approval, ratification, encouragement, and authorization of excessive use of force by Fresno police officers, including in this case; and failure to properly train and supervise its police officers in the use of force, despite knowledge of a pattern of excessive force by Fresno police officers. These acts, omissions, and policies contributed to the shooting of Steven Vargas.

Doc. # 84 at ¶¶ 28-29.

It appears to the court that both parties have confined their arguments to the issue of whether Palomino violated Decedent's due process rights under the Fourth Amendment. Thus, both parties seem somehow to have missed the point of Plaintiffs' second claim for relief. The facts of this action are, however, fairly well developed and the standards of a Fourteenth Amendment claim for loss of companionship are well established. The court therefore finds that the issue is suitable for decision on Defendants' motion for summary judgment without further briefing.

"The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child, [citations], and that a 'child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest.' [Citations.]" Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991) (internal citations omitted); see also Roberts v. United States Jaycees, 468 U.S. 609, 619-620 (1984) ("Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life."); Smith v. City of Fontana, 818 F.2d 1411, 1488 (9th Cir. 1983) (holding there exists a constitutional interest in familial companionship and society that extends to childrens' relationship with their parents just as the same constitutional interest exists in the relationship between parents and children). Defendants do not challenge the right of Decedent's wife, parents, children and stepchildren to sue for constitutional injury under the Fourteenth Amendment for loss of companionship and society, not can the court see any legal basis for such opposition. The court therefore

19

finds Plaintiffs have properly pled claims for relief pursuant to section 1983 based on constitutional injuries under the Fourteenth Amendment that are personal to *them* and that arise from the infringement of Decedent's Fourth Amendment Rights.

A claim for loss of companionship implicates substantive due process rights under the Fourteenth Amendment. See Smith, 818 F.2d at 1419-1420 (because the state has no legitimate interest in interfering with liberty interests arising from familial ties by using excessive force, the protections offered by the substantive due process clause are appropriate). In the context of claims for loss of companionship, such claims are judged under the standards of "deliberate indifference or reckless disregard." See Smoot v. City of Placentia, 950 F.Supp. 282, 283-284 (C.D. Cal. 1997) (citing Lewis v. Sacramento County, 98 F.3d 434, 441 (9th Cir. 1996).

As the court noted in setting forth the legal standard for decision, the evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587. Plaintiffs have presented evidence in the form of statistical and expert opinion to indicate that: (1) Officers from Department participated in a number of officer involved shootings between 2005 and 2010 that was significantly higher than experience in other, similarly sized municipalities would suggest is normal; (2) Department, and Chief Dyer, were aware of at least the raw number of shootings and (3) Dyer and Department consciously instituted a method of review of officer involved shootings that would foreseeably lead to extensive delays in reaching conclusions and that would be ineffective in protecting the public's rights against application of unreasonable force. Although the court understands that Plaintiffs' proffer and characterizations of the facts supporting their claims of Fourth and Fourteenth Amendment violation are hotly contested, the court again cannot conclude that, as a matter of law, there remains no issue of material fact as to whether Department and Dyer were deliberately indifferent to the violations of citizens' rights when they formulated and used a review process that does not produce a timely conclusion and certain response to unjustified shootings. The court therefore finds

20

1    that summary judgment as to Plaintiffs' second claim for relief is not appropriate.

2         As something of an aside, the court notes that although Plaintiffs' second claim for

3    relief is nominally pled against all Defendants (according to the heading), Defendant

4    Palomino is not mentioned anywhere in the claim and the body of the claim alleges neither

5    facts or law linking Palomino to the alleged Fourteenth Amendment violation.  The court

6    therefore finds that, whatever the subjective intentions of the parties may be, Plaintiffs'

7    second claim for relief does not state any Fourteenth Amendment claim against Palomino.

8    **III.  Plaintiffs' State Law Claims**

9         Plaintiffs' third and fourth claims for relief allege wrongful death and negligence,

10   respectively, both under California common law.  In both cases, the claims are alleged against

11   all Defendants.  "The elements of the cause of action for wrongful death are the tort

12   (negligence or other wrongful act), the resulting death, and the damages, consisting of the

13   pecuniary loss suffered by the heirs." Quiroz v. Seventh Ave. Center, 140 Cal.App.4th 1256,

14   1263 (2006); Wright v. City of Los Angeles, 219 Cal.App.3d 318, 344, (1990). The

15   California Supreme Court has held that "an officer's lack of due care can give rise to

16   negligence liability for the intentional shooting death of a suspect." Munoz v. Olin, 24 Cal.3d

17   629, 634 (1979) (citing Grudt v. City of Los Angeles, 2 Cal.3d 575, 587 (1970)).  Thus, the

18   tort claims for wrongful death and negligence are connected for purposes of the present

19   motion for summary judgment in that the ability of either to withstand Defendants' summary

20   judgment motion is dependent on Plaintiffs' ability to show there remains an issue of material

21   fact as to whether Palomino's shooting of Decedent was negligent.  The court notes

22   parenthetically that while the two claims are linked for purposes of this analysis, the claims

23   protect different interests.  Wrongful death is a cause of action belonging to the survivors of

24   the person wrongfully killed and is measured by their loss.  Negligence or negligent homicide

25   is a cause of action belonging to the deceased person and is measured by his or her damages.

26   In essence, wrongful death and negligence are the state tort claim analogues of federal claims

27   under Section 1983 for violation of the survivor's Fourteenth Amendment rights and the

28   Decedent's Fourth Amendment rights, respectively.

1    As Defendants point out, the negligence element of both of Plaintiff's tort claims is

2   dependent on a determination that Palomino's shooting of Decedent was unreasonable.  See

3   Munoz v. City of Union City, 120 Cal.App.4th 1077, 1100-1101 and n.6 (1st Dist. 2004);

4   Abston v. City of Merced, 2011 WL 2118517 (E.D. Cal. 2011) at *16 ("Plaintiffs' claim for

5   negligence-wrongful death flows from the same facts as the alleged Fourth Amendment

6   violation for excessive force and are measured by the same reasonableness standard.").

7   Given that the court has found that Defendants have failed to carry their burden to show that

8   there remains no issue of material fact as to whether Palomino's use of force in shooting

9   Decedent was objectively reasonable, summary judgment on Plaintiffs' state law tort claims

10   against Palomino is not warranted for the same reason.

11    Palomino's reliance on immunity under California Penal Code § 196 is unavailing

12   since immunity under that section requires that the officer's killing was "necessarily

13   committed in overcoming actual resistance to the execution of some legal process. . . ."  As

14   discussed above, Defendants have not been able to demonstrate that there remains no issue of

15   material fact as to whether the shooting of Decedent was necessary, i.e. was objectively

16   reasonable under all the circumstances, or was a result of actual resistance by Decedent.

17   Department's contention that they are not liable because their officers are immune fails for

18   the same reason – officer immunity has not been established.  Under California law

19   municipal entities are liable under the doctrine of respondeat superior for acts of their

20   employees.  Cal. Gov. Code § 815.2; Abston, 2011 WL 2118517 at *16-*17 (summary

21   judgment in favor of municipality where issue of material fact remains as to officer's action

22   is not warranted).

23    THEREFORE, for the reasons discussed above, the court hereby ORDERS that

24   Defendants motion for summary judgment or summary adjudication is hereby DENIED in its

25   entirety.

26   IT IS SO ORDERED.

27

28   Dated:    October 24, 2011    _____

CHIEF UNITED STATES DISTRICT JUDGE