# Exhibit B

**Exhibit B**

# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

July 15, 2011

Arturo J. Gonzalez, Esq.
Wesley E. Overson, Esq.
Theodore M. Hasse, Esq.
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

**Regarding:**   *Julia Enriquez, et al. v. City of Fresno, et al.*, **USDC Case No. 10-CV-00581 AWI DLB.**

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding the October 27, 2009 shooting death of Mr. Stephen Vargas by Fresno Police Department (FPD) Sergeant Mike Palomino.  Pursuant to the requirements of Rule 26, I have studied the reports, depositions, recordings and other material (as listed below) provided to me thus far regarding this case.  I am informed that the deposition of Sergeant Mike Palomino is being held today, July 15, but a transcript of the deposition will not be available immediately.  Please be advised that once I am able to review the deposition transcript, it may be necessary to supplement this report.  I also reserve the right to supplement my opinion should additional information be provided by the defendants or otherwise come to light.

Please note that I do not make credibility determinations in expressing my opinions.  That is, where there are differences in the events proffered by the defendants versus those proffered by the plaintiffs, I do not opine for the trier of fact regarding who are the more believable witnesses.  The resolution of any such conflicts is the purview of a jury to decide.  Taking any such differences (such as they are) into account, my opinions thus far are expressed below.

## MATERIAL CONSIDERED

1. The plaintiffs' First and Second Amended Complaints.

2. The FPD documents submitted pursuant to discovery requests, including radio and telephonic recordings, photographs, recorded interviews, Investigators' notes, Crime Laboratory reports, Autopsy Report, transcripts of recordings and transmissions, personnel records, transcripts of interviews with Sergeant Palomino and witnesses after the shooting incident, etc.

3. I.A. and criminal investigation files regarding FPD shooting incidents produced by the defendants.

4. Declarations of Lt. Richard Weger and Sgt. Michael Hight.

5. POST Learning Domain # 1: "Leadership, Professionalism, and Ethics."

6. POST Learning Domain # 2: "Criminal Justice System."

7. POST Learning Domain #3: "Policing in the Community."

8. POST Learning Domain # 20: "Use of Force."

9. POST Learning Domain # 21: "Patrol Techniques."

10. POST Learning Domain #22: "Vehicle Pullovers."

11. POST Learning Domain #23: "Crimes in Progress."

12. POST Learning Domain # 33: "Arrest Methods/Defensive Tactics."

13. POST Learning Domain #34: "First Aid and CPR."

14. POST Learning Domain #35: "Firearms/Chemical Agents."

15. My personal visit at the incident scene on April 13, 2011.

16. Satellite photographs of the incident scene from Google maps.

17. Deposition of City of Fresno (Lt. Dennis Montejano, Sgt. Sean Biggs, Captain Lydia Carrasco, and Chief Jerry Dyer).

18. Data from the U.S. Census Bureau website.

19. Deposition of Aurelio Santiago.

20. Deposition of Arthur Lopez.

21.     Deposition of Wanda Lopez

22.     VARGAS_0000569 to VARGAS_0000574.

23.     VARGAS_0000100 to VARGAS_0000119.

24.     Video walk-through of scene.

25.     FBI crime statistics from the FBI website.

26.     Standards for Law Enforcement Agencies, 5th Ed., CALEA (2009).

27.     Office of Independent Review 2010 Mid-Year Report, Eddie J. Aubrey, J.D. (Sept. 2010).

28.     City of Fresno's Response to Amado Vargas' Interrogatory No. 14.

29.     D-1233 to D-1269.

30.     D-1698 to D-1701, D-1271 to D-1425, D-1466 to D-1642.

31.     D-1698 to D-1709 (Officer Shooting Log; Bates stamps overlap with item 30).

32.     D-1461 to D-1465.

33.     Fresno County Grand Jury Final Report # 7, June 3, 2011.

34.     Jim Nichols, *Supercop Braces for Criticism*, Plain Dealer, July 11, 2008, at A1.

35.     http://www.nyc.gov/html/nypd/downloads/pdf/
        public_information/RAND_FirearmEvaluation.pdf

## I.   THE STEVEN VARGAS SHOOTING

### A.   Facts

There are a number of significant facts which do not seem to be in dispute.  They include:

1.     On October 27, 2009 at approximately 2:52 pm, Mr. Steven Vargas was observed driving his red Chevy Suburban eastbound in the westbound lanes on East McKinley Avenue, Fresno, CA.

2.     Mr. Vargas was the driver and sole occupant of the Chevy Suburban.

3.     Mr. Vargas slowly crossed over the north curb at 4021 E. McKinley Avenue, traveled eastbound across the front yard and contacted a Dodge van parked in the yard and parallel with the east property line.

4.      The impact caused slight denting and the continued slow force pushed the van east.

5.      Mr. Vargas never exited his vehicle and never said anything to any residents or officers.

6.      A nearby witness (Aurelio Santiago) reported that Mr. Vargas may be under the influence of PCP.  He reported the suspicion via a cellular telephone to a 911 operator and expressed his suspicion to FPD Field Sergeant Palomino after he arrived at the scene.

7.      Prior to the reported incident, neither Mr. Vargas personally nor his vehicle had been broadcast as connected to any criminal activity.  Additionally, no recent criminal activity had been reported in the general area, and Sergeant Palomino did not connect Mr. Vargas or his vehicle to any previous known criminal activity.

8.      While the 911 call was in progress, Sergeant Palomino (Unit 203), happened by the scene as he was returning to his station at the end of his shift.

9.      Sergeant Palomino received no information regarding the incident from the FPD dispatcher—his sole source of information was from the events he observed and statements he heard while at the scene.

10.     After being flagged down, Sergeant Palomino requested additional assisting units.

11.     Within just 31 seconds of his radio transmission, Sergeant Palomino broadcast that he had fired his gun.

12.     Mr. Vargas had no weapon in his hands when he was shot to death, and no weapons were discovered inside his Suburban after the shooting incident.

13.     Sergeant Palomino fired his gun at Mr. Vargas while standing in the open and on the sidewalk approximately 15-20 feet to the south-east of the passenger side of the Suburban.  He did not afford himself the protective cover provided by his patrol vehicle which was parked only feet away.

14.     Mr. Vargas never left the driver's seat of his vehicle or even unbuckled his seatbelt.

15.     Sergeant Palomino did not await the momentary arrival of assisting units before approaching and shooting Mr. Vargas.

**B.      Overview of Events**

On October 27, 2009 at approximately 2:52 pm Mr. Steven Vargas was observed driving

his red Chevy Suburban on East McKinley Avenue, Fresno, California—a divided residential roadway with two eastbound lanes and two westbound lanes. His vehicle entered westbound into the eastbound lanes. Mr. Vargas was the driver and sole occupant of his vehicle.

At 4021 E. McKinley Avenue, Mr. Vargas' vehicle slowly crossed over the north curb and continued eastbound across the front yard and struck the passenger side of a Dodge van that was parked pointed south in the yard and parallel with the east property line. The impact caused slight denting. The continued slow pressure from the SUV pushed the van east. Mr. Vargas never exited his vehicle and never said anything to any residents in the area or responding officers.

A nearby witness, Aurelio Santiago, observed Mr. Vargas driving before Mr. Vargas arrived at 4021 E. McKinley Avenue, and briefly observed Mr. Vargas as he was seated in the driver's seat of his SUV. Mr. Santiago has stated that he was concerned at Mr. Vargas' disoriented and unresponsive appearance and believed that he was under the influence of "KJ"—a local street name for PCP. Mr. Santiago reported his suspicion to a 911 operator. He also expressed his suspicion to Sergeant Palomino that Mr. Vargas was on PCP after Sergeant Palomino arrived.

While talking on his cell phone, Sergeant Palomino happened by 4021 E. McKinley Avenue while he was on his way to return to the FPD station after his shift. Sergeant Palomino had not received any information about what was happening at the site of the shooting from his dispatcher before he shot Mr. Vargas.

I have reviewed the transcript of the investigation interview of Aurelio Santiago and the transcript of his deposition, and I understand Aurelio Santiago has claimed that he said "gun" at the scene while Sergeant Palomino was present. However, a CHP 911 dispatch recording of a call Mr. Santiago made during the incident indicates that Aurelio Santiago did not say "gun" at the scene while Sergeant Palomino was present. It is my opinion that the techniques used in the initial investigation interview of Mr. Santiago were improper—including deliberately leading the witness. In my experience, demonstrably inaccurate accounts by a witness can be explained by improper interview techniques.

I also note that based on Mr. Santiago's alleged proximity to Sergeant Palomino, and the content of the recording, it appears that nobody said "gun" in Sergeant Palomino's presence. Also based on Mr. Santiago's proximity to Sergeant Palomino, and the content of the recording, it appears that there were not multiple people in Sergeant Palomino's vicinity attempting to communicate with him. To the extent, however, that it would be alleged that the scene was crowded, Sergeant Palomino's conduct would have created an unacceptable danger to the people around him. In any event, it is undisputed that nobody at the scene said that they had *seen* a gun.

Sergeant Palomino apparently never questioned any person at the scene about whether

they had seen any weapon. Nor did he consider the possibility that Mr. Vargas was in a medical crisis. Rather, Sergeant Palomino simply accepted whatever brief statement that may have been made without any questions or verification, and shot Steven Vargas less than a minute after arriving. Even pointing his gun at Mr. Vargas at this point was a departure from reasonable conduct and created a danger to Mr. Vargas' safety.

Prior to the reported incident, no recent criminal activity had been reported in the general area, and Sergeant Palomino did not connect Mr. Vargas or his vehicle to any previous known criminal activity.

Upon being flagged down and exiting his vehicle, Sergeant Palomino requested additional assisting units. Within just 31 seconds of his radio transmission, Sergeant Palomino broadcast that he had fired his gun.

While Sergeant Palomino stood on the sidewalk (approximately 15-20 feet from the passenger side of the SUV), he shouted the verbal command "let me see your hands" at the SUV. While this occurred, Sergeant Palomino did not afford himself (as expected and required) protective cover—including the obvious protective cover provided by his patrol vehicle which was parked only feet away.

The record is also clear that Sergeant Palomino did not consider alternative possibilities causing the erratic driving that occurred such as diabetic shock, stroke, seizure, mechanical failure, etc., and he did not await the momentary arrival of assisting units before approaching and shooting Mr. Vargas.

Sergeant Palomino has alleged that Mr. Vargas did not comply with his verbal commands and made a movement with his hands downward and out of Sergeant Palomino's view. Sergeant Palomino has claimed that when he could not see Mr. Vargas' hands, he fired his gun at Mr. Vargas in self-defense and fear of his life. I am informed that Sergeant Palomino has fired his weapon in a police shooting on seven occasions.

A subsequent examination of Mr. Vargas' SUV established that the transmission was in drive, the engine was still running and the radio was on loud enough to be heard by investigators from the sidewalk. This fact brings into question Mr. Vargas' ability to hear any of Sergeant Palomino's verbal commands.

Mr. Vargas was not armed when he was shot to death. No weapon was in his hands and no weapons were discovered inside his SUV after the shooting incident.

C.   **Analysis of the Shooting**

   1.   **The Departure from Proper Procedures Due to the Failure to Ask Any Questions at the Scene Before Drawing his Weapon.**

Sergeant Palomino claims that at least one person at the scene was saying both "knife and

gun," and other people said other things to him. According to Sergeant Palomino's account of the events, he was receiving vague and differing accounts of a critical fact that would impact how he would proceed. His failure to do what is dictated by proper procedure and common sense—simply ask "is it a knife or a gun?" or "who saw a gun"— set the stage for the rest of the improper actions Sergeant Palomino would take that led to his killing Steven Vargas. Had he asked, it would have been immediately apparent that there was not information that he could reasonably rely upon since nobody would say that they saw a gun, a knife, or any other weapon. Even if he had confirmed that a suspect had a gun under these circumstances it would have been reckless to respond as he did, however, Sergeant Palomino might have acted differently if he had the most basic information by following proper procedures and even just using common sense.

### 2.   The Departure from Proper Procedures Due to The Failure to Wait For Backup

Officers are taught at the POST Basic Academy that there are fundamental tactics that are required as a professional standard of care. They are also taught that when they depart from the required tactics it creates an unacceptable and unnecessary risk to themselves, their fellow officers, the suspects that they encounter, and the public generally.

The circumstances of this incident were that when Sergeant Palomino arrived and requested assisting units, Mr. Vargas was still seat-belted in his vehicle and was not a credible imminent lethal threat to anyone at the scene. He simply allegedly had not responded or acknowledged any shouted orders (which he may not have heard due to the volume of his vehicle stereo).

If Sergeant Palomino was concerned about a possible weapon, additional officers were necessary (and had been requested) before any direct contact occurred. Sergeant Palomino should have waited for help. Instead, he chose to handle the situation alone before the arrival of his assigned backup units (which were due to arrive within seconds). Sergeant Palomino's failure to await additional assisting units and, as the Sergeant on scene, tactically deploy them from positions of safety ("cover") were key causes of the tragic shooting death of Mr. Vargas. Confronting Mr. Vargas under the circumstances created an unreasonable danger to Mr. Vargas.

### 3.   The Departure from Proper Procedures Concerning Approaching Suspects in Vehicles

There are established protocols taught at basic police training academies to all certified officers. In this regard, it is helpful to compare what occurred during this incident in view of the basic tactical steps expected from POST certified officers. Some agencies use the term: "Time, Talking, and Tactics." A great deal of emphasis is placed on tried and proven tactics at the POST Basic Academy with the strong message that incompetent tactics will invariably lead to unnecessary injury and/or death. The basic tactical steps

required when encountering a suspect in a vehicle are as follows:

*Containment*:

This phase includes getting the subject under control by restricting any opportunity to flee or change position so that a safe apprehension can occur. Initially, this can be a difficult problem when the vehicle is still in flight and not responding to lights and sirens to pull over. This was not a problem facing Sergeant Palomino since Mr. Vargas was seat-belted at the driver's seat and his vehicle had come to rest against the van parked in the front yard of the residence. Once stopped (as was the case here), the professional wisdom (as taught by POST) is to relieve the emotional pressure on the driver/suspect—as well as that of the witnesses—await sufficient assisting units, and (if appropriate) coordinate them into a team effort to keep the driver contained while officers remain in positions of safety.

POST training in this regard is precise. Officers are taught that leaving the safety of cover and standing in the open (as occurred here) is a forbidden tactic. It is defined by POST as a "Fatal Error" and indicates a "Tombstone Mentality" that will likely cause unnecessary injury and/or death to citizens and officers. (Learning Domain # 22—"Vehicle Pullovers").

In this incident, Mr. Vargas, as the driver and sole occupant of the SUV, remained seated inside the SUV when it came to rest. Because the SUV had already come to a stop, there were no further steps needed to contain it. To the extent that further containment was a concern, then it could have easily been blockaded by responding officers or using Sergeant Palomino's own cruiser. Once contained, the remaining proper tactical steps could have been implemented. Sergeant Palomino failed to follow this first critical step by deliberately standing in the open, endangering Mr. Vargas by pointing a loaded weapon at him while Mr. Vargas was in no condition to respond, without any cover whatsoever, without any containment of the vehicle, and trying to handle the situation alone and without waiting for his backup units to arrive.

*Decompression:*

Properly trained officers are educated that humans have an instinctive protective reflex that will take control of the body during extreme stress. This instinctive response, officers are taught, is commonly called the "flight-fight" response and it occurs in the citizens they come into contact with when that citizen perceives danger. Through a subconscious processing of the situation, people will invariably flee or, when there is no other option, they will fight to either ward off the danger or to create an avenue of escape. Trained and experienced police officers have both seen and experienced this human response. It is a basic fact of

life in the business of police work, and something every experienced officer is trained to cope with.

Officers are trained that there is always a point during any sudden demand upon a subject when it becomes counterproductive and can only be expected to drive the subject into a state of incoherent dread and terror rather than compliance. Thus, the necessity for a decompression pause wherein rational activity—such as meaningful communication between Mr. Vargas and Sergeant Palomino—could take place. This did not occur in this case. An example of actions contrary to this essential tactical objective occurred when Sergeant Palomino stood on the sidewalk with gun drawn and within seconds expected Mr. Vargas to respond to his shouted commands. Such acts can only logically continue the "flight-fight" panic response and exacerbate (rather than mitigate) the situation. As Sergeant Palomino knew that Mr. Vargas was in an impaired condition, Sergeant Palomino should have known that Mr. Vargas may be unable to conform his response to Sergeant Palomino's commands. Decompression and observation of the subject is all the more critical under such circumstances.

*Communication:*

In this phase, Sergeant Palomino should have established a verbal contact with Mr. Vargas from a position of safety (cover). During this time, unknown issues such as health problems, language problems, impairments caused by intoxication, mental illness, emotional anxieties, and other issues that may interfere with a safe apprehension become known, and are dealt with by the officers.

Ignoring this key phase of contact often leads to the situation deteriorating into confusion. Such undisciplined acts will cause potentially fatal injuries. The necessity for a calm and skilled officer-subject communication cannot be overstated. When this does not occur, officers and civilians alike can be injured or killed.

*Instruction:*

Once the communication link has been established, a clear set of instructions which contain enough detail to avoid surprises are conveyed to the contained subjects. In this incident, it would include how to exit the SUV, how to assume a position that will facilitate a safe apprehension, and what not to do, etc. Thus, all parties would clearly understand what will occur during the compliance stage before it occurs.

*Compliance:*

In this phase, the subject (Mr. Vargas) would indicate to the communicating

officer that he understands what he is expected to do and that he will comply with the instructions. Subjects are always given the opportunity to ask any questions for clarity and to demonstrate their understanding of the instructions.

*Surrender:*

This phase requires the subject to physically perform the acts necessary to place himself or herself in the required place and position for the arrest team to approach and take him or her into custody.

*Detention/Apprehension:*

This final phase includes the actual, proper, reasonable physical restraint of the subject (if necessary), a search for any weapons, and his safe transport to a facility for booking if the circumstances warrant it.

Officers are trained that good police tactics are not only important for the safety of officers, they are also essential for the safety of the public at large. Far too often innocent persons are injured or killed by incompetent and unnecessary police acts—particularly during apprehensions of criminal suspects. I have noted that Sergeant Palomino's failure to follow the proper procedures resulted in him firing multiple rounds—which included a reload of his gun—in a residential neighborhood with Mr. Vargas being killed and other civilians put at risk.

### 4.    Sergeant Palomino's Improper Use of Deadly Force

Officers are trained that the use of deadly force constitutes a lawful and justifiable act of self-defense when the officer using deadly force actually and reasonably believes one or more of the following facts exist:

- That there is an imminent danger that the person against whom the deadly force is used will either kill or cause great bodily injury to another person.

- That it is necessary under the circumstances to use deadly force to prevent that person from killing or causing great bodily injury to the officer confronting the suspect.

- That it is necessary under the circumstances to prevent the escape of a suspect who presents a clear danger to the community as evidenced by the nature of the crime or other obvious factors. In such cases, deadly force is not allowed to prevent the escape of misdemeanants and most felony suspects.

Thus, it is necessary to determine whether the use of deadly force was justified here. Sergeant Palomino has stated that he fired his weapon in self-defense of an unknown (and apparently imaginary) weapon. However, in my opinion, under the set of facts as demonstrated here, Sergeant Palomino could not have reasonably believed that any such

condition existed when he decided to point his weapon at Mr. Vargas without any cover and then fire his gun at Mr. Vargas.

The POST training domains in this regard have identified an officer's mentality to make such a decision (to depart from basic tactics) as: "Tombstone Courage." That is: "Overly anxious to show one's own courage; [and] Attempting to handle dangerous situations beyond one's ability." (POST Learning Domain # 21, pages 1-21.) POST has also given a specific name to tactical mistakes that are likely to lead to injury or death as: "*Fatal Error.*"

Officers are trained that force used in self-defense must be proportional to the threat, and that force used to control must be "objectively reasonable" under the circumstances. Police officers are also trained that by accepting their badges and guns they must act at all times in consideration of the extreme value our society places on all human life, even when that means facing certain risks themselves. Firing one's firearm at a human being is different from all other police uses of force.

There are, indeed, other police tactics that qualify as "deadly force," but none carry the same high probability of death than when the officer fires his gun. Accordingly, police officers are trained that they can only use firearms under the most extreme circumstances—to prevent death or serious bodily injury to themselves or others. These situations are very rare. The vast majority of police officers in the United States never fire their weapons in the field during their entire careers.

Here, by presenting himself in an open area without cover and by drawing his weapon and pointing it at Mr. Vargas, who remained in his vehicle with his seat belt on and appeared disoriented, he unnecessarily provoked a deadly sequence.

Even though Sergeant Palomino broke fundamental tactical rules by going into the open and confronting Mr. Vargas in this way, in my opinion there were still opportunities to protect himself and avoid shooting Mr. Vargas. One obvious step is to simply maintain a safe distance. Sergeant Palomino could have simply stepped away (a tactical retreat). He was well aware that other officers were due to arrive shortly and would assist him in safely dealing with any actual or imagined threat.

Officers are trained at the POST Basic academy that the use of force must meet an *"Objectively Reasonable"* standard. Further, POST teaches early on in the basic curriculum the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

> The criminal justice system gives law enforcement two extraordinary powers:
>
> 1.     The power of arrest and

2.      *The power to use deadly force.*

The authority to do so does not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost of care and restraint.*  This is why it is important to emphasize that *peace officers do not confer "police powers" on themselves.*  These powers come to the criminal justice system from the people they serve.

(Learning Domain #2: "Criminal Justice System," page 1-4.  Emphasis added.)

Additionally, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "Totality of Circumstances."  (Learning Domain # 20 "Use of Force," Chapter 2.)

POST training specifies that the use of force under the "Totality of Circumstances" is only justified on the basis of an "objectively reasonable" standard.  In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear.  The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances.  POST defines "Unreasonable Fear" as: Generated in the officer's mind with no direct correlation to facts and situations.*  (Learning Domain # 20, Chapter 5. Emphasis added.)

Sergeant Palomino also should have been trained to know that he was legally and morally required to assess potential threats solely according to an "objectively reasonable" standard (rather than from a subjective fear) and to respond to any such perceived threat on that basis:

Officers must develop the ability to intelligently and objectively identify threats to their safety and the safety of others.  Factors that officers must consider when assessing a potential threat include the:

- Nature of the threat that must be overcome.
- Presence of a firearm and the type of firearm.
- Seriousness of the offense.
- Person's age, history and capabilities.
- Officer's capability to overcome the resistance.
- Availability of assistance from other officers.

- Location and surroundings including the:
- level of danger to bystanders, or
- time of day.

(POST Learning Domain # 35 "Firearms/Chemical Agents," pages 5-32.)

### D.   Opinions Regarding the Shooting of Steven Vargas

Across the country, police departments for decades have recognized and trained their officers in multiple ways to apprehend recalcitrant/nonresponsive suspects without resorting to lethal force. These methods are well-known and have proven to be effective for the safety and welfare of officers, subjects, and the public. Sergeant Palomino used none of these methods. In this regard the shooting death of Mr. Vargas demonstrates Sergeant Palomino's failure to follow the California Peace Officer Standards and Training (POST) regarding the proper tactics and procedures.

Officers should also be trained that they are not justified in a use of lethal force when their deliberate decisions and actions are contrary to reasonable and required tactics. Sergeant Palomino's actions in this case, with respect to the tactics and amount of force used, reflected, at best, a reckless disregard to the life and safety of Mr. Vargas. Sergeant Palomino's actions in this incident appear as deliberate (and not accidental), and as the cause of the cascading series of events that culminated in the unnecessary shooting death of Mr. Vargas.

Sergeant Palomino's use of lethal force was unlawful under the circumstances and contrary to generally accepted police officers standards and procedures both in his conduct leading up to the shooting, including pointing his gun at Mr. Vargas (particularly in the state Mr. Vargas was in), and his decision to fire his gun, then reload and fire again..

1.   The use of a handgun by a police officer constitutes the use of lethal force and could only be justified as a defense against a *credible lethal threat*. Under the version of events given by Sergeant Palomino, his use of lethal force was excessive and unreasonable. Mr. Vargas was confined inside his vehicle and sufficiently separated from Sergeant Palomino when the shooting occurred. Sergeant Palomino never saw a weapon of any kind in Mr. Vargas' possession. He did not ask any questions of any of the bystanders what they had seen themselves, or on what basis they believed Mr. Vargas might have a weapon. Sergeant Palomino also had access to positions of safety (cover) and room to tactically maneuver if necessary. There was no need to draw his weapon under these circumstances.

2.   Mr. Vargas did not pose an "imminent lethal threat" to Sergeant Palomino or any bystanders when he drew his weapon and pointed it at Mr. Vargas.

His use of deadly force was therefore inappropriate, excessive, and unreasonable, and also violated fundamental policing standards.

3.    The use of deadly force in connection with this incident was also unreasonable because there were far more reasonable options available besides shooting Mr. Vargas. There were fundamental errors and a gross lack of situational awareness in this incident. In my experience, a significant number of civilian deaths involving police result from a series of cascading departures from expected and required tactics. This appears as a key factor in the downward spiral of events resulting in the shooting death of Mr. Vargas.

4.    The apparent approval of Sergeant Palomino's actions in this incident (and the data regarding other incidents provided by the defendants pursuant to discovery requests as discussed below) also demonstrates the FPD has a practice of using deadly force contrary to the POST principles. I have seen no evidence that Sergeant Palomino (or any of the shooting officers or their field supervisors) were either disciplined, or at a minimum, re-trained in proper arrest methods, tactical deployments, or use of force. Indeed, the evidence is that the practice is for the officers to return to duty immediately or within days of the shootings, even where the person who was shot was unarmed.

5.    If an officer is told at the scene of an incident conforming to the facts of the Vargas shooting that the driver of the SUV has a gun, then the officer should ask who saw the gun, or "how do you know he has a gun?" If Sergeant Palomino had done so, he would have immediately known that nobody had a basis to believe that Mr. Vargas was armed. Likewise, if an officer is told that the driver of the SUV has a "weapon," a "gun or knife," a "knife," or that "someone says" one of the above, the officer should immediately ask who saw it or "how do you know he has a weapon?"

6.    Once an officer receives the most basic information, that is, whether there is a basis to believe the man in the SUV is armed, the officer should clear away all of the bystanders if he believes there is a basis for concern for their safety.

7.    After that, an officer acting properly would move to a position of safety and wait for backup, and if possible to do so safely, continue to observe the driver in the vehicle to try to better determine what is going on. An officer acting properly under the circumstances should never have endangered the driver's life by pointing his gun.

8.    Were an officer to make the potentially fatal mistake of leaving cover and

approaching the driver and threatening the driver with a gun, the officer should already know that there is no reasonable basis to believe that the driver is armed, thus he should not shoot if the driver were to reach somewhere in the compartment of the vehicle with his hand. If, by a failure to follow proper procedures as with Sergeant Palomino, he did not know there was no reasonable basis to believe the driver was armed, then upon seeing the driver reach somewhere within the compartment, the officer should immediately move to a position of safety where he could wait for backup to properly deal with the subject, who is apparently incoherent.

9.   Further, were an officer to act so recklessly as to end up firing his gun at the driver, as Sergeant Palomino did, he should have stopped firing his gun once the danger had passed. There is no indication that Mr. Vargas was reaching around for a gun after Sergeant Palomino fired off the initial bullets of his first clip. Thus, there was no basis for the decision to empty the entire first clip, let alone start firing again with a reloaded gun.

10.  A properly trained officer would not have caused the tragedy of Mr. Vargas' shooting death. In my experience, improper actions by an officer tend to indicate improper training. This is particularly likely where an officer's improper actions are later ratified by other officers in the organization, since their misperception that the actions were proper strongly indicates that they too were not properly trained and thus the training properly is systematic. And where officers are repeatedly acting improperly, as at the FPD, and they are repeatedly found to have not engaged in wrongdoing, improper or inadequate training is extremely likely.

## II.   DELAYED INVESTIGATIONS CREATE A DANGEROUS CULTURE

I have also been asked to discuss the FPD's delays in reviewing officer involved shootings (OIS or "officer shootings"). The length of time that investigations into officer involved shootings are left unresolved is, in short, unlike anything I have seen before and completely unreasonable. The FPD's OIS investigations are typically left unresolved for several years. Chief Dyer, who makes ultimate determinations on discipline, does not review the investigations until they are completed, in many cases after officers have already gone on to be involved in more shootings. The Commission on Accreditation for Law Enforcement Agencies' (CALEA) Standards for Law Enforcement Agencies, subscribed to by the FPD, sets a mandatory requirement that agencies have a written directive specifying a time limit for completing I.A. investigations. (52.2.3.) This reflects principles essential to properly handling these matters: the time required to complete an investigation should be predictable and reasonable. This is further reflected by CALEA's stated purpose for mandatory reporting procedures for officer shootings; that is, to provide "timely information." (Commentary to 1.3.6.) Optional standards

previously published by CALEA and noted in case law regarding the specific time limits provide guidance and context for comparing the multi-year delays in FPD investigations: "52.3.6[:] A written directive specifies a 30-day time limit for completing an internal affairs investigation, with status reports due every seven days." <u>State ex rel. Billy Ray C. v. Skaff</u>, 194 W. Va. 178, 182 (W. Va. 1995)  The FPD practices convey the message to officers that any misconduct in shooting a civilian will not be examined for years, if at all.

Meanwhile, FPD officers are returned to the streets almost immediately after a shooting, and years before they can expect any outcome to an investigation.  By contrast, CALEA's mandatory standard 1.3.8 calls for agencies to establish a written policy that would require officers "whose action(s) or use of force in an official capacity results in death or serious physical injury, be removed from line-duty assignment, pending an administrative review."  The associated commentary makes clear one of the key purposes of this common sense standard—"to protect the community's interest when employees may have exceeded the scope of their authority in their actions or in their use of force . . ."  The FPD's practice is all the more remarkable when it is noted that for all of the officers who fired their guns at a person from 2005–2010 and again on a subsequent occasion, *each officer's subsequent shootings occurred while the officer's first shooting in the time period was still being investigated.*  Twenty officers involved in shootings from 2005–2010 have been involved in two or more shootings since 2002.  (Data prior to 2002 has not been produced by the defendants.)  Twenty-five of the fifty-four shootings from 2005-2010 were these officers' second or subsequent shootings; that is, nearly half of the shootings were repeat shootings.



## FRESNO PD REPEAT SHOOTINGS AND SHOOTINGS BY FIRST-TIME SHOOTERS FROM 2005–2010

Legend:
- ▣ Repeat Shootings
- ▣ First-time Shooters

46%

54%

## REPEAT SHOOTERS WITH SHOOTINGS IN THE 2005–2010 PERIOD
### — 20 Shooters Total —

| | | | | | |
|---|---|---|---|---|---|
| **1. Palomino** (5) | Shooting: 2/24/2009 | Shooting: 10/27/2009 | *Pre-2005:* 9/10/2003 | *2 or more pre-2002 shooting* | |
| | Closed: 5/5/2010 | Investigation Still Open | Closed: 9/24/2004 | *Dates Unknown* | |
| **2. Castillo** (5) | Shooting: 2/20/2007 | Shooting: 2/1/2008 | Shooting: 6/21/2008 | Shooting: 9/25/2009 | Shooting: 11/10/2010 |
| | Investigation Still Open | Investigation Still Open | Investigation Still Open | Investigation Still Open | Investigation Still Open |
| **3. Meiss** (5) | Shooting: 1/14/2006 | Shooting: 8/3/2006 | Shooting: 1/26/2008 | Shooting: 5/31/2009 | *Pre-2005:* 2/7/2004 |
| | Closed: 10/29/2010 | Closed: 3/31/2009 | Investigation Still Open | Investigation Still Open | Closed: 6/21/2006 |
| **4. Tafoya** (4) | Shooting: 5/6/2005 | Shooting: 6/18/2005 | Shooting: 11/25/2005 | *Pre-2005:* 7/22/2004 | |
| | Closed: 4/5/2011 | Closed: 12/15/2009 | Closed: 9/10/2010 | Closed: 5/13/2008 | |
| **5. Nadeau** (4) | Shooting: 5/31/2009 | Shooting: 7/16/2010 | Shooting: 9/13/2010 | *Pre-2005:* 5/4/2004 | |
| | Investigation Still Open | Closed: 2/9/2011 | Investigation Still Open | Closed: 3/14/2007 | |

| 6. Cooper (4) | Shooting: 7/3/2005 | *Pre-2005*: 9/5/2003 | *Pre-2005*: 4/14/2004 | *Pre-2005*: 7/22/2004 | |
| | Closed: 6/19/2005 | Closed: 5/21/2008 | Closed: *Unknown* | Closed: 5/13/2008 | |
| 7. Hoagland (3) | Shooting: 2/20/2007 | Shooting: 2/1/2008 | Shooting: 11/4/2009 | | |
| | Investigation Still Open | Investigation Still Open | Investigation Still Open | | |
| 8. Harrell (3) | Shooting: 5/31/2009 | Shooting: 2/28/2009 | Shooting: 12/22/2010 | | |
| | Investigation Still Open | Closed: 5/7/2010 | Investigation Still Open | | |
| 9. McQuay (3) | Shooting: 8/21/2005 | *Pre-2005*: 7/16/2003 | *Pre-2005*: 5/25/2002 | | |
| | Closed: 3/21/2011 | Closed: 1/17/2007 | Closed: 2/8/2005 | | |
| 10. Vincent (3) | Shooting: 9/1/2006 | *Pre-2005*: 9/1/2002 | *Pre-2005*: 12/16/2002 | | |
| | Closed: 11/13/2010 | Closed: 5/17/2005 | Closed: 2/5/2009 | | |
| | | | | | |

| Officers with two shootings in the 2005–2010 time period: |
| --- |
| **11. Anderson:** 6/18/2005 (closed: 12/15/2009), 2/1/2007 (closed: 9/22/2009) |
| **12. Surabian:** 2/1/2007 (closed: 9/22/2009), 9/17/2007 (Open) |
| **13. Gonzalez:** 11/30/2008 (closed: 5/3/2010), 3/3/2009 (Open) |

| Officers with one shooting in the 2005–2010 time period and one shooting in 2002, 2003, or 2004: | |
| --- | --- |
| **14. Benson:** 2/7/2004, 1/14/2006 | **18. Fern:** 12/12/2003, 2/11/2010 |
| **15. Borrego:** 12/16/2002, 9/17/2007 | **19. Sturgeon:** 10/26/2003, 2/20/2007 |
| **16. A. Campos:** 9/5/2003, 6/18/2005 | **20. Taliaferro:** 7/22/2004, 2/1/2007 |
| **17. Sanchez:** 2/7/2004, 5/6/2005 | |

In every case from 2005–2010 with a final determination, the FPD has determined that the shooting was within department policy, even in the many cases where the person shot was unarmed.

Further, I am informed that the tolling provision under the law enforcement bill of rights does not apply in these cases. *See* Gov. Code § 3304(d)(2)(A). Thus, the statute's deadline of one year to discipline an officer for an incident passed during the pendency of a review of the shooting in almost every case. This means that officers will never be disciplined even in the unlikely event their conduct was found to be contrary to law or FPD policy.

This misconduct on the part of the FPD leads to a culture of understanding that OIS

investigations are not serious and officers can shoot with impunity.  With regard to the seriousness of the investigations, I am also informed that officers have been promoted during the pendency of "open" investigations in the 2005–2010 time period, further demonstrating that these investigations are not taken seriously.  This culture results in wrongful shootings and deaths that otherwise may not have occurred, such as the shooting of Steven Vargas by Sergeant Mike Palomino, and a higher rate of shooting generally as further discussed in Section IV below.

Below I attach a table listing of OIS investigations from 2005–2010 with information on the time taken to review the shootings.

| Report No. | Time Waited to Close | Report No. | Time Waited to Close |
|---|---|---|---|
| 2005-0025 | 4 yrs. 4 mos. 10 days | 2006-0142* | 4 yrs. 2 mos. 15 days |
| 2005-0032 | 1 yr. 2 mos. 13 days | 2007-0058 | 2 yrs. 7 mos. 21 days |
| 2005-0067 | 3 yrs. 7 mos. 9 days | 2007-0056 | **Still Open: 4+ years** |
| 2005-0071 | 5 yrs. 10 mos. 30 days | 2007-0118 | **Still Open: 3.5+ years** |
| 2005-0078 | 11 mos. 4 days | 2007-0125 | **Still Open: 3.5+ years** |
| 2005-0097 | 4 yrs. 5 mos. 27 days | 2008-0012 | **Still Open: 3+ years** |
| 2005-0098* | 3 yrs. 11 mos. 21 days | 2008-0016 | **Still Open: 3+ years** |
| 2005-0103 | 3 yrs. 11 mos. 9 days | 2008-0024 | **Still Open: 3+ years** |
| 2005-0129 | **Still Open: 5+ years** | 2008-0044 | **Still Open: 3+ years** |
| 2005-0137 | 5 yrs. 2 mos. 14 days | 2008-0076 | **Still Open: 3+ years** |
| 2005-0146 | 1 yr. 4 mos. 25 days | 2008-0117 | **Still Open: 2.5+ years** |
| 2005-0180 | 4 yrs. 9 mos. 16 days | 2008-0132 | **Still Open: 2.5+ years** |
| 2006-0008 | 4 yrs. 9 mos. 15 days | 2008-0138* | 1 yr. 5 mos. 4 days |
| 2006-0043 | **Still Open: 5+ years** | 2009-0007* | 1 yr. 8 mos. 9 days |
| 2006-0096 | 4 yrs. 6 mos. 2 days | 2009-0037* | 1 yr. 2 mos. 9 days |
| 2006-0114 | 3 yrs. 2 mos. 10 days | 2009-0044* | 1 yr. 2 mos. 9 days |
| 2006-0137* | 4 yrs. 3 mos. 29 days | | |
| 2006-0138 | 2 yrs. 7 mos. 28 days | | |

| Report No. | Time Waited to Close | | Report No. | Time Waited to Close |
|---|---|---|---|---|
| 2009-0045 | **Still Open: 2+ years** | | 2010-0065 | **Still Open: 1+ years** |
| 2009-0055 | **Still Open: 2+ years** | | 2010-0082 | **Still Open: 1+ years** |
| 2009-0087 | **Still Open: 2+ years** | | 2010-0092 | **Still Open: 11 months** |
| 2009-0109* | 1 yr. 3 mos. 8 days | | 2010-0093 | **Still Open: 11 months** |
| 2009-0137 | **Still Open: 1.5+ years** | | 2010-0119 | **Still Open: 9 months** |
| 2009-0155 | **Still Open: 1.5+ years** | | 2010-0127 | **Still Open: 9 months** |
| 2009-0156 | **Still Open: 1.5+ years** | | 2010-0132 | **Still Open: 8 months** |
| 2009-0159 | **Still Open: 1.5+ years** | | 2010-0149 | **Still Open: 7 months** |
| 2010-0009 | **Still Open: 1+ years** | | 2010-0157 | **Still Open: 6 months** |
| 2010-0025 | **Still Open: 1+ years** | | 2010-0161 | **Still Open: 6 months** |

*\* No D.A. review for these shootings.*

I am informed based on the Mid-Year 2010 report of the Fresno Office of Independent Review that it took an average of 39.6 months to close 26 cases. Since this figure only accounted for already closed cases, and could not account for the many investigations that were still "open" that exceeded 39.6 months at that time (including two from 2004, six from 2005, and seven from 2006), the average time to close investigations would rise higher than three years and four months as investigations were closed. As noted in the report by the Independent Auditor, with regard to the closure rate, "there is some guidance from the policies of the two largest populated and well-established counties in California." From 2002–2009, officer shooting investigations were completed in approximately 7.5 months by the San Diego Police Department and in approximately nine months by the Los Angeles County Sheriff's Department.

## III.   FPD SHOOTING PATTERNS AND IMPROPER INVESTIGATIONS

### A.   Trends and Findings

There were 54 officer involved shootings by FPD officers from 2005-2010. The defendants have produced investigation files for 51 of those shootings. Having reviewed the information produced by the defendants, I am of the opinion that 19 of the 51 shootings were not reasonable and thus unjustified. I describe the facts and provide comments on 18 shootings below, the 19th being the shooting of Steven Vargas, which is discussed at length above. At the outset, however, several trends should be noted. First

and foremost, the most crucial trend is that more than one-third of the 2005-2010 FPD shootings cannot be justified.



In my opinion, at least **35%** of these shootings were unreasonable.  It cannot be determined with certainty that the remaining 32 were reasonable since we are limited to the facts presented by the FPD in investigations that are improperly conducted and unreasonably delayed.  Thus, these conclusions are reached on the FPD's own presented facts.  Nonetheless, in every instance that a determination has been made, the FPD has concluded that all of the shootings were "within policy."

The second trend that is important to note is that nearly all of the victims in these unreasonable shootings were unarmed, including Steven Vargas.  Remarkably, in all but three cases, the victim was unarmed; and of those three victims only one had a firearm, and that firearm was tucked in the victim's belt.  (See chart below.)





The third trend is that certain circumstances are common to most of the unreasonable shootings—that is, the person shot or shot at is in a vulnerable position, including either running away or (as with Mr. Vargas) in a vehicle.  74% were in one of those two states when the shooting occurred.  (See chart above.)

The fact of the high number of questionable shootings, the fact that these shootings have been deemed "within policy" by the FPD in spite of their unreasonableness, and the high rate of shootings of unarmed individuals and individuals fleeing or confined in a vehicle, all point to a custom and practice of police officers shooting without justification and doing so with the knowledge that they will not be held accountable.

**B.** **Summaries of Unreasonable Shootings**

    **i.** ***Shootings with Victims Running Away***

**1.** **OIS-10-0127 – SEPT. 24, 2010 (CLOSED APRIL 14, 2011)**

**FPD DETERMINATION:**       **"WITHIN POLICY"**
**DISCIPLINE OR RETRAINING:**    **NONE**

**FACTS:**      **UNARMED, SHOT IN THE BACK WHILE RUNNING AWAY.**  Officer shot an unarmed 25-year-old Hispanic male after the man fled on bike and foot when the officer tried to stop him for not having a bike headlamp.

- Officer Avila was in a patrol car late at night when he attempted to stop Hector Orozco for riding a bicycle without a headlamp.
- Orozco continued riding his bike, asked why he was being stopped and allegedly said, "fuck you" to Officer Avila.
- When Orozco stopped, Officer Avila asked him for his name and whether he was on parole or probation.  Orozco refused to answer his questions and allegedly said "fuck you" again and rode off.

- Officer Avila followed Orozco in his patrol car and claims he saw Orozco look back and reach for his waistband.  Officer Avila slowed down; Orozco increased his speed and allegedly said "fuck you" when Officer Avila ordered him to stop.
- Orozco collided with a bush, dismounted his bicycle, and ran.  Officer Avila exited his car and chased Orozco on foot.  Orozco allegedly was looking back at Officer Avila; Officer Avila un-holstered his gun and ordered Orozco to show his hands.
- Officer Avila stated that he would shoot if Orozco did not show his hands.
- Orozco then turned towards Officer Avila, allegedly with his hands near his front waistband.
- Officer Avila fired 6 rounds at Orozco; Orozco fell to the ground and shouted, "I give up" and "fuck, you shot me."
- Officer Avila fired a seventh shot when Orozco allegedly started to get back on his feet and reach for his front waistband; Orozco was shot in his buttocks area and had a grazing wound to his ear.  He was dragged a short distance and handcuffed.

**COMMENTS:** The salient facts in this situation are familiar: The suspect was fleeing, and unarmed.  Orozco is an individual who ran away when he was pulled over for having no head lamp on a bicycle.  Neither lethal force, nor threatening lethal force, was justified under the facts as reported.

## 2.   OIS-09-0159 – NOV. 4, 2009 (OPEN)

| | |
|---|---|
| **FPD DETERMINATION:** | **NO OFFICIAL DETERMINATION** |
| **DISCIPLINE OR RETRAINING:** | **NO DISCIPLINE OR ADMINISTRATIVE ACTION INDICATED** |

**FACTS:**   **PERSON WITH KNIFE OR UNARMED, SHOT WHILE RUNNING AWAY.**
Officer repeatedly shot at and hit a 22-year-old black male allegedly armed with a knife after the man jumped over a fence during a foot chase.

- While responding to a report of an armed robbery (allegedly with a knife), officers spotted Dedrick Mitchell, who matched the description of the suspect.
- Mitchell saw the officers and ran from them.  Officers Hoagland and Messick chased him in a patrol car.  They lost sight of Mitchell after he jumped over a fence.  Officer Hoagland exited the car and chased Mitchell on foot through an apartment complex.
- While Officer Hoagland chased Mitchell to a chain link fence and commanded him to stop, his duty weapon was "in a low ready position."
- Mitchell jumped the fence and simultaneously heard Officer Hoagland yell, "stop or I'll shoot."  Officer Hoagland immediately started shooting at him.  Officer Hoagland continued shooting at Mitchell after Mitchell had fallen to the ground.

- Mitchell denied having a knife and said he was willing to take a polygraph test. Several witnesses did not see anything in Mitchell's hands.
- Officer Hoagland backed up and shot at Mitchell five or six times. Mitchell yelled and fell to the ground, and then he jumped up and continued running toward another apartment complex.
- Officer Hoagland shot at Mitchell a second time, "until his magazine was empty" (13 rounds total).
- Mitchell hid in his girlfriend's apartment for the next 4-5 hours. He had been shot 3 times.
- Mitchell's girlfriend eventually called his mother, who then called a local news station. When the news truck arrived to the apartment complex, Mitchell's mother approached officers and led them to Mitchell while insisting that he get medical attention. Mitchell was taken into custody and to the hospital.
- Officers found a knife with a 4-inch blade in Mitchell's girlfriend's apartment.
- Although several witnesses were interviewed, allegedly none of them (not even Officer Messick) saw the actual shooting.

**COMMENTS:** The victim was on the opposite side of the fence from the shooting officer when he was shot, allegedly armed with a knife. The victim was not a threat. There was no basis for shooting at him in the first instance or when he continued to flee. This is an unjustified shooting.

3.     **OIS-08-0076 – JUNE 20, 2008 (OPEN)**

| | |
|---|---|
| **FPD DETERMINATION:** | **NO OFFICIAL DETERMINATION** |
| **DISCIPLINE OR RETRAINING:** | **NO DISCIPLINE OR ADMINISTRATIVE ACTION INDICATED** |

**FACTS:**     **UNARMED, SHOT AT WHILE RUNNING AWAY.** Officer repeatedly shot an unarmed 25-year-old black male suspect in the back when the man attempted to surrender after entering a senior citizen living facility and attempting to hide from the officer.

- Officers A. Castillo and Stephen Taylor located and followed a suspect vehicle that had been car jacked. The carjacker was reportedly a Hispanic female, Carolyn Schumann. Schumann's husband, Khalid Lanier, was driving the car and she was in the front seat.
- Lanier tried to escape when the police attempted to pull them over.
- Officer Castillo intentionally crashed his car into the suspect car.
- Lanier and Schumann ran from the car in different directions. Officer Castillo claimed that he saw a "metallic object" in Lanier's hand.
- Lanier ran inside a senior living facility, allegedly moving his hands towards his waistband as he did so. Officer Castillo chased Lanier through the facility into a cafeteria.

- Officer Castillo entered the doorway of a cafeteria and saw Lanier in a "somewhat kneeling position" behind a table and saw that Lanier was "holding something in his hand."
- Officer Castillo ordered Lanier to get on the ground; Lanier stood up and moved toward a door that was behind him.  Officer Castillo shot 3 rounds at Lanier from approximately 6-7 feet away, as he walked further into the room.
- Lanier was hit in the back of his upper right arm and in the middle of his back.

COMMENTS: Khalid Lanier was shot in the back while fleeing from police, and trying to hide.  There is no basis to believe that it was necessary to shoot him, even if the police account were true.  Lanier also did not fit the description of the alleged carjacker at all, being that he is a black man and the carjacker was a Hispanic woman.  There was no basis to suspect that Lanier, guilty of fleeing from police in a stolen vehicle, was armed or dangerous.

4.   OIS-06-0142 – AUG. 31, 2006 / SEPT. 1, 2006 (CLOSED NOV. 16, 2010)

FPD DETERMINATION:          "WITHIN POLICY"
DISCIPLINE OR RETRAINING:    NONE

FACTS:     UNARMED, SHOT AT WHILE RUNNING AWAY. Suspect Shane Stone ran from Officer Vincent when Vincent tried to approach to arrest him allegedly because he was a parolee believed to be in possession of a firearm.  Officer Vincent commanded Stone to stop or be shot.  Allegedly seeing Stone reaching for his waistband as he fled, Officer Vincent fired one shot at him, which missed. Stone then surrendered.

- Vincent encountered Stone sitting in a car.  Stone approached, Vincent shined a light on him, and announced that he was a police officer.  Stone turned and ran.
- Vincent ordered Stone to stop or be shot.
- Stone turned a corner and allegedly reached for his waistband.
- Stone stumbled again, leaned forward and allegedly again reached for his waistband, then allegedly started to turn toward Vincent.
- Vincent then fired one round at Stone, but did not hit him.
- Stone immediately put his hands behind his head and surrendered.  He was unarmed.

COMMENTS: Stone did nothing but run from Vincent and his partner, and there is nothing in the report—besides the references to reaching for his waistband (with no sighting of any gun)—that makes his behavior imminently threatening.  Vincent's partner, Officer Grijalva, who was running 6 feet behind Vincent, reported that he could not see the suspect's hands just before Vincent shot at him and that the area was "narrow and dark."  This shooting is not reasonably justified under such circumstances.

5.    **OIS-08-0138 – Nov. 30, 2008 (Closed May 3, 2010)**

**FPD Determination:**           **"Within policy"**
**Discipline or Retraining:**    **None**

**Facts:**    **Unarmed, shot at while running away.** Officers responded to a "shots fired" call, then chased a car with two suspects until it crashed in a field. The driver attempted to run away and officers fired at him, but missed. Both suspects were arrested.

- Officers responded to a "shots fired" call and observed the suspects' car—driven by Eric Hughley with passenger Kevin Shrubb—leaving the area.
- Officers attempted a traffic stop, but the car did not stop.
- Officers claim they believed the suspects discarded a gun from the car window.
- No gun was ever found.
- The suspects' car went off the road into a "ponding basin" and crashed.
- Officers encountered Hughley attempting to pull Shrubb from the wrecked car.
- Officers ordered Hughley to get on the ground, but he turned and ran.
- Officers claimed Hughley reached down toward his waistband and looked back at the officers, while he was fleeing.
- The officers then fired at him; their shots missed.
- Hughley immediately surrendered.

**Comments:** There was no lethal threat here. The suspect was running away and no gun was ever seen. If the officers did, in fact, see a gun thrown out of the car, then there was no longer any threat of a gun being used against the officers.

6.    **OIS-09-0007 – Jan. 1, 2009 (Closed Sept. 1, 2010)**

**FPD Determination:**           **"Within policy"**
**Discipline or Retraining:**    **None**

**Facts:**    **Unarmed, shot in the back while running away.** Officer shot a Hispanic male and his girlfriend after officers chased the man into a crowded apartment, injuring a bystander.

- Officers responded to a call that Danny Hernandez was arguing with someone and showing off a gun at a party at his apartment.
- Officers approached Hernandez after he left the apartment; he ran back to the apartment; officers chased him and forced their way in after he tried to close the door.
- Hernandez allegedly reached for his waistband and turned towards the officers.
- Officer Chavez fired 2 rounds, shooting Hernandez once in the lower back and his girlfriend, Gabriella Rodriguez, in the inner thigh.

**COMMENTS:** Shooting at a suspect under these circumstances created a deadly hazard to the people at the party and was not justified as officers never saw a gun. When the officers approached the party, and observed Hernandez outside, they saw no weapon. Upon seeing police, Hernandez ran back to the party and tried to close the door. Numerous partygoers were inside the residence, and discharging firearms in such a situation is likely to wound or kill innocent persons—which, in fact, occurred. In a situation where there is a reasonable expectation that a shot fired by a police officer would cause injury or death to innocent persons, officers must not shoot.

### 7.   OIS-09-0109 – JULY 21, 2009 (CLOSED OCT. 29, 2010)

**FPD DETERMINATION:**         **"WITHIN POLICY"**
**DISCIPLINE OR RETRAINING:**   **NONE**

**FACTS:**     **UNARMED, SHOT AT WHILE RUNNING AWAY.** Officer repeatedly shot at, but did not hit a black male who fled from a traffic stop.

- Salahuddin Muhammad drove away when Officer Ploharz initiated a traffic stop.
- Muhammad hit another car and crashed into a fence.
- While Muhammad was climbing out of his car; Officer Ploharz ordered him to stop.
- Muhammad climbed the fence his car had crashed into; Officer Ploharz shot at him while he did so.
- Muhammad made it over the fence and ran through a dirt lot.
- Officer Ploharz chased Muhammad and shot at him a second time.
- Another officer apprehended Muhammad, who was uninjured.

**COMMENTS:** What occurred originally was a routine traffic stop. Nothing in this set of facts points to there being a gun, and even if there were a gun, shooting at Muhammad while he climbed a fence—in the highly unlikely event he would attempt to do so with a gun in his hand—is unjustified. Two witnesses state they did not see anything in Muhammad's hands. Since the suspect was unarmed and a fleeing misdemeanant, there was no basis to shoot him. Of note, Sergeant Palomino approved the report prepared by the officer who arrested Muhammad.

### 8.   OIS-05-0103 – JULY 3, 2005 (CLOSED JUNE 12, 2009)

**FPD DETERMINATION:**         **"WITHIN POLICY"**
**DISCIPLINE OR RETRAINING:**   **NONE**

**FACTS:**     **QUESTIONABLE AS TO WHETHER ARMED, SHOT IN THE BACK WHILE RUNNING AWAY.** Officer shot a 31-year-old white male in the back, killing him, after the man ran from officers and was attacked by a police canine.

- Jeremy Carter ran away when officers began to question him because he allegedly matched the description of a robbery and murder suspect. He was not the suspect officers sought.
- Officer Cooper released his canine; the dog bit Carter on his leg.
- Carter allegedly dropped a gun while struggling with the dog.
- Carter then allegedly picked up the gun and turned towards Officer Cooper.
- Officer Cooper fired 4 rounds at Carter while repeatedly yelling "gun!".
- A second officer tased Carter, then handcuffed him.
- Carter died at the scene.
- A gun was found approximately 5 feet from his body.

**COMMENTS:** The FPD summary memorandum misstates facts and includes events that are not corroborated in the case file (*e.g.*, that Officer Cooper saw Carter reach into his pocket before releasing the canine, and that Carter actually picked up a gun and turned towards the officers before he was shot). It is not plausible that Carter was able to pick up a gun and turn towards the officers while being attacked by the canine. Additionally, Carter was shot 4 times and tased in the back. This makes it unlikely that he was turning toward the officers when he was shot. If a gun was not in Carter's hand, then Officer Cooper's use of force was not objectively reasonable. There is no physical evidence linking Carter to the gun (*i.e.*, fingerprints).

### ii. *Shootings with Victims Enclosed in a Vehicle*

### 9. OIS-05-0097 – JUNE 18, 2005 (CLOSED DEC. 15, 2009)

| | |
|---|---|
| **FPD DETERMINATION:** | **"WITHIN POLICY"** |
| **DISCIPLINE OR RETRAINING:** | **NONE** |

**FACTS:** **UNARMED IN A VEHICLE.** Three officers shot and killed a 21-year-old unarmed Hispanic male because he allegedly made threatening movements when sitting in the passenger seat of a stopped car.

- Officers Tafoya and Anderson chased and stopped a car in which Daniel Mendoza, a wanted suspect for a prior shooting, was a passenger.
- Officers Tafoya and Anderson approached the car with weapons drawn and ordered Mendoza and the driver, Abraham Orozco, to raise their hands; Officer Campos approached the passenger side of the car.
- Both Orozco and Mendoza raised their hands; Mendoza allegedly dropped his left hand.
- The officers fired 2 rounds of shots at Mendoza because the first round did not hit him and he allegedly reached down a second time; Mendoza was unarmed.
- Mendoza died from 7 gunshot wounds; the driver was not hit.

**COMMENTS:** This is a classic example of deliberate departure from fundamental high-risk pullover tactics. It is also an example of how an FPD officer can fire his weapon at unarmed persons and escape consequence by simply stating that the civilian moved, or reached for something. The officers had options that could have prevented this deadly shooting. Officer Tafoya has been involved in at least 4 separate shooting incidents.

**10.    OIS-06-0138 – AUG. 3, 2006 (CLOSED MAR. 31, 2009)**

| | |
|---|---|
| **FPD DETERMINATION:** | **"WITHIN POLICY"** |
| **DISCIPLINE OR RETRAINING:** | **NONE** |

**FACTS:**    **UNARMED IN A VEHICLE.** Officer shot and killed an unarmed 25-year-old Hispanic male when the man allegedly reached toward his waistband in the backseat of a car.

- Officers chased and stopped a car because Joaquin Figueroa, suspected of shooting an officer a few days earlier, was in the backseat.
- Figueroa exited the car and ran from the officers.
- An officer ("O-2") hit Figueroa with his car.
- Figueroa re-entered the back seat of the car.
- Officer Meiss approached and said, "Let me see your hands."
- The FPD summary memorandum alleges Figueroa moved his hands toward his waist.
- Officer Meiss fired two rounds at Figueroa, striking him in the chest and killing him. Figueroa was not armed.

**COMMENTS:** Figueroa was shot in a neutral and contained position in the back seat of a car.

**11.    OIS-08-0024 – FEB. 23, 2008 (OPEN)**

| | |
|---|---|
| **FPD DETERMINATION:** | **NO OFFICIAL DETERMINATION** |
| **DISCIPLINE OR RETRAINING:** | **NO DISCIPLINE OR ADMINISTRATIVE ACTION** |

**FACTS:**    **UNARMED IN A VEHICLE.** Officers shot an unarmed 41-year-old white male after they found him stripping a stolen SUV and after the man ran the SUV into an unoccupied police car.

- Officers Murray and Higginbotham were dispatched to a stolen SUV that was being stripped by David Stump.
- As O-1 parked diagonally behind the SUV, Stump walked from the back of the SUV to the driver's side door.
- O-1 and O-2 (O-1's trainee) approached the SUV with their guns drawn and ordered Stump to exit the SUV. O-1 approached the driver's side door; O-2

approached the front passenger door and tried to break the front passenger window with an expandable baton.

- Stump started the SUV and backed into the patrol car.
- O-1 then fired 3 shots at the driver.
- Stump then maneuvered the SUV out from between the patrol car behind him and a car parked in front of the SUV.
- Stump had 2 gunshot wounds in his chest and one in his left wrist.
- O-1 and O-2 ran back to their patrol car as Stump drove off; a short chase ensued.
- Stump then exited the SUV in the middle of the road and surrendered.
- Stump repeatedly asked, "Why did you guys shoot me?"

**COMMENTS:**      The man who was shot was stealing parts from a car. He backed the SUV into an unoccupied vehicle. Witnesses indicated that one of the officers started shooting before the man tried to escape. The officers faced no lethal threat when they chose to use deadly force. As is common in these shootings, the victim was vulnerable in a car and was apparently seeking to escape when he was shot.

## 12.   OIS-10-0065 – MAY 20, 2010 (CLOSED ON OR AROUND APRIL 11, 2011)

**FPD DETERMINATION:**          **"WITHIN POLICY"**
**DISCIPLINE OR RETRAINING:**   **NONE**

**FACTS:**      **UNARMED IN A VEHICLE.** Police pursued suspect Juan Rayas, who failed to yield after a traffic stop, to a cul-de-sac street. With police cars on both sides of the street, Rayas did a U-turn and drove toward the officers' cars to exit the cul-de-sac. Rayas hit a parked car and one police cruiser while turning around, and Officer Lyon opened fire as Rayas drove toward his car. Lyon fired 12 shots (a full magazine), but none hit Rayas.

- Officer Lyon was outside his car, at the curbside, and his partner was in the passenger seat.
- Although officers gave varying estimates of the speed of Rayas' truck as it approached police cars—anywhere from 20 to 35 mph—officers also noted that Rayas' truck had at least one flat tire, which affected Rayas' ability to control his vehicle.
- Lyon fired his first shots as Rayas was approaching him, but he fired the majority of the shots as Rayas' truck was already passing or past him.

**COMMENTS:** This is a case of a traffic violator trying to elude police and driving slowly in his attempt. An officer shot at the man from a position of safety as the vehicle drove slowly by. Thus, there was no credible lethal threat to the officers of any kind during the incident. The shooting was unjustified.

### iii.   *Shootings Under Other Circumstances*

**13.   OIS-05-0067 – APRIL 30, 2005 (CLOSED DEC. 9, 2008)**

**FPD DETERMINATION:**          NONE
**DISCIPLINE OR RETRAINING:**   NONE

**FACTS:**     **UNARMED.** Off-duty officer shot and killed his unarmed 34-year-old brother in the officer's home.

- While off-duty, Officer Sanchez called 911 from his home to report that he shot his brother, Arthur Sanchez.
- There was no sign of forced entry in Officer Sanchez's home.
- Arthur's body was seated in an arm chair in the living room in front of a video game controller; he had been shot 12 times.
- Officer Sanchez was taken to the FPD; he refused to answer questions.
- Officer Sanchez was terminated for insubordination because he refused to answer questions about the shooting.
- Prior to the shooting, Arthur had accused Officer Sanchez of having an affair with Arthur's wife.
- Officer Sanchez claimed his brother was on drugs, however, Arthur's toxicology report showed that he had no drugs or alcohol in his system.

**COMMENTS:** The facts as reported point to an unjustified homicide of his brother by Officer Sanchez. A motive is apparent (the shooter was accused of having an affair with the deceased's wife); there is no evidence of a struggle; the deceased was unarmed, sitting in a chair; there was a deliberate effort to kill (the deceased was shot 12 times); and there were no defensive wounds. Nonetheless, the shooting was not found to violate FPD policy.

**14.   OIS-10-0093 – JULY 17, 2010 (CLOSED APRIL 14, 2011)**

**FPD DETERMINATION:**          "WITHIN POLICY"
**DISCIPLINE OR RETRAINING:**   NONE

**FACTS:**     **UNARMED.** Officer shot an unarmed 41-year-old black male on a second story landing above the officer after the man "did not initially comply" with an order to show his hands.

- While responding to a report of a subject armed with a handgun in an apartment complex after midnight, Officers H. Garcia, Jr. and Benito Soto saw Vernal Jones walk out of the complex.
- The officers followed Jones to a nearby apartment complex. Jones walked up a flight of stairs and onto a second story landing.
- The officers remained downstairs and asked Jones for his name as he appeared to be entering an apartment.

- After Jones turned towards Officer Garcia without acknowledging him, Officer Garcia saw Jones "doing something" with his right hand and asked him if he had a gun.
- Officer Garcia pointed his handgun (with an attached flashlight) at Jones, and repeatedly commanded Jones to show his hands. Jones did not initially comply and allegedly said that he had a gun.
- Officer Garcia claims he "saw a silver and black colored object in Jones' right hand as Jones was turning towards them."
- Officer Garcia fired four rounds at Jones, hitting him in the left shoulder, left thigh, right buttocks and upper pelvic area.
- Jones was not armed.

**COMMENTS:** The officers were in a position of safety. The officers deliberately put themselves in danger. The nature of the call did not justify lethal force until they were certain Jones was the actual subject of the call or they actually saw a gun.

### 15.    OIS-09-0037 – FEB. 24, 2009 (CLOSED MAY 3, 2010)

FPD DETERMINATION:          "WITHIN POLICY"
DISCIPLINE OR RETRAINING:   NONE

**FACTS:**      SHOT AT WHILE HOLDING A PIPE. Officers shot at and tased a 39-year-old Hispanic male hit-and-run suspect while he stood on a loft above them holding a pipe.

- Samuel Velasquez ran into a warehouse after a hit-and-run accident with a police motorcycle.
- Officers found Velasquez on a loft above them in the warehouse, holding a metal pipe; officers told him to drop the pipe.
- Velasquez allegedly raised the pipe and approached the edge of the loft.
- Officer Palomino fired 2 shots; Officers Lucero, Rodems & Astacio each fired 1 shot; none of the shots hit Velasquez.
- Another officer (Bustos) shot at and hit Velasquez with a taser gun.
- Velasquez fell from the loft to the ground (8-10 feet).

**COMMENTS:** There was no credible lethal threat in this case. There was sufficient distance between the suspect, allegedly armed with a pipe, and the officers such that they could have used other, non-lethal options to apprehend him.

### 16.    OIS-2009-0137 – SEPT. 23, 2009 (OPEN)

FPD DETERMINATION:          NO OFFICIAL DETERMINATION
DISCIPLINE OR RETRAINING:   NO DISCIPLINE OR ADMINISTRATIVE ACTION
                            INDICATED

**FACTS:**      **UNARMED, SHOT IN THE BACK.** Officers fatally shot an unarmed 28-year-old Hispanic man in the back, while he held a "shiny" flip cell phone that officers purportedly mistook for a weapon.

- Officers Castillo and Bowling followed up on the whereabouts of Lonnie Graham after he had been involved in a foot chase with police after being pulled over.
- Officers Castillo and Bowling arrived at the house of Graham's ex-girlfriend and saw that he was walking out of the house onto the front porch to greet his girlfriend who was in a vehicle.
- One of the officers secured the girlfriend in the car while the other officer chased Graham toward the backyard.
- The first officer to reached Graham pulled his weapon out and commanded Graham to stop.
- After securing Graham's ex-girlfriend the second officer joined the first officer in the backyard.
- While Graham was facing them, the officers claim to have noticed a shiny object in his hands near his waistband.
- The officers ordered Graham to drop the object.
- Then, Graham turned his back to the officers.
- The officers responded by shooting at Graham seven times. Graham was shot in the upper back, elbow, side of the stomach, and the back of the head.

**COMMENTS:** A properly trained officer should know the difference between a cell phone and a gun. The movement described by the officers did not justify shooting. No matter how provocative they found the man's decision to put his back to the officers, they had no right to shoot him. This shooting was unjustified.

## 17.    OIS-08-0016 – FEB. 1, 2008 (OPEN)

**FPD DETERMINATION:**          **NO OFFICIAL DETERMINATION**
**DISCIPLINE OR RETRAINING:**   **NO DISCIPLINE OR ADMINISTRATIVE ACTION INDICATED**

**FACTS:**      Two officers shot an armed 23-year-old Hmong male when the man allegedly pointed a gun at them from behind a wrought iron fence. The officers had arrived at a house to investigate a shooting at another location because they believed they might find a shooting suspect at this house.

- O-1 and O-2 were in an undercover police car checking houses associated with an Asian gang they suspected might be involved in a drive-by shooting.
- O-2 noticed a car he claimed was similar in appearance to a suspect vehicle from the drive-by in the driveway of the house they were approaching. (It was not the same vehicle.)

- Shooting victim Michael Fang was a family member of the residents.  He was outside smoking when O-1 and O-2 approached him.
- While looking at the vehicle in the driveway, O-2 heard male voices on the east side of the house.
- The male voices stopped talking when O-2 approached a wrought iron gate leading to a side yard or the house's backyard.
- O-2 allegedly saw Fang, who was on the other side of the gate, with a handgun in his front waistband.
- O-2 removed his gun from its holster and put it in "low ready" position, then he saw Fang draw the gun out of his front waistband and point it towards the ground while walking towards him.
- From about 12 feet away, O-2 pointed his gun with an attached flashlight at Fang and ordered him to drop his gun.  A white car that Fang was standing behind blocked O-2's view of Fang's torso and feet.
- O-1 joined O-2 at the gate, at which point O-1 allegedly identified himself as a police officer and also instructed Fang to drop his gun.
- According to O-1 and O-2, Fang had his gun raised above the hood of a broken down vehicle and pointed at them.
- Both officers fired at Fang from the other side of the fence.
- Fang fell to the ground; he had been shot twice: once in the right upper arm and once on his right side.

**COMMENTS:** The first officer to arrive to the scene after the shooting stated in his report that he "physically observed [O-1] remove the suspects [sic] handgun from the rear of his waistband and place it on the roof of a vehicle that was parked just inside the wrought iron gate on the east side of the residence."  With Fang's gun in his waistband when he was shot, the officers did not have proper justification to shoot him.  The investigation file does not include any documentation regarding a work-up of Fang's gun.  Fang's gun was not mentioned at all in the FPD's forensic report.

18.    **OIS-05-0032 – FEB. 12, 2005 (CLOSED APR. 25, 2006)**

**FPD DETERMINATION:**            **"WITHIN POLICY"**
**DISCIPLINE OR RETRAINING:**     **NONE**

**FACTS:**      **UNARMED IN A VEHICLE.** Officer shot at an unarmed 35-year-old white male when the man allegedly backed his car into the officer's motorcycle.

- Officer Jansen attempted to stop Timothy Stokes' vehicle because the vehicle's headlights were not on and it was dark outside.
- Stokes stopped, allegedly reversed his car, and then bumped into Officer Jansen's motorcycle as Officer Jansen was dismounting the motorcycle behind Stokes' vehicle.

- Officer Jansen jumped out of the way and fired two shots at Stokes; neither round hit Stokes.
- Stokes fled and was taken into custody shortly thereafter.

**COMMENTS:** The investigation documented minimal damage to the motorcycle.  The damage described was from the motorcycle falling over.  The expected damage from ramming was not documented.  The officer was not injured.  Whether the motorcycle was rammed or not, there is no evidence of a credible lethal threat to the officer, since the man was driving away from the scene.

## IV.    FRESNO SHOOTING RATE DEMONSTRATES SHOOTING CULTURE

The customs, practices, and culture described above will lead to an increased likelihood for officers to shoot when it is not necessary to do so reflected in part by a higher rate of shootings.  An increased rate of shootings can be a strong indicator of a failure in the discipline, supervision, or training of officers in a department.  A comparison of Fresno's rate of shootings per 100,000 residents to a similarly sized city, Sacramento, and the most populous city in Northern California, San Jose, demonstrates a dramatically higher rate of shootings:



**Police Shootings per 100,000 Residents**

### Police Shootings per Year and per 100,000 Residents

| | Population [n.1] | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | TOTAL | Yearly Avg. | Per 100,000 |
|---|---|---|---|---|---|---|---|---|---|---|
| San Jose | 945,942 | 4 | 3 | 0 | 0 | 3 | 5 | 15 | 2.5 | 0.26 |
| Sacramento | 466,488 | 5 | 7 | 1 | 0 | 0 | 4 | 17 | 2.8 | 0.60 |
| Fresno | 494,665 | 12 | 7 | 4 | 8 | 11 | 12 | 54 | 9 | 1.82 |

Footnotes:

[n.1] 2010 U.S. Census Data.

[n.2] Lt. Richard Weger declaration.

[n.3] Sgt. Michael Hight declaration.

[n.4] D-1461 - D-1465.

Put another way, a citizen moving from Sacramento to Fresno will be more than 3 times more likely to be shot by police after they move to Fresno, and a citizen moving from San Jose to Fresno will be 7 times more likely to be shot by police. What is demonstrated is the expected pattern of the FPD's acts and omissions with regard to police shootings: more citizens will be shot by police due to an increased propensity to shoot and an increased number of unreasonable shootings. As discussed in Section III above, many of the shootings that I have reviewed should never have happened. If those unreasonable shootings were avoided, Fresno would have a shooting rate much more in line with the cities compared in this sampling.

A comparison of the number of violent crimes in each city as compared to their number of shootings each year also reflects a serious problem for Fresno:

| VIOLENT CRIMES VS. POLICE SHOOTINGS | 2005 | 2006 | 2007 | 2008 | 2009 | 2010* | AVG. |
|---|---|---|---|---|---|---|---|
| FRESNO VIOLENT CRIMES | 3,897 | 3,524 | 3,043 | 2,782 | 2,933 | 3,034 | |
| Fresno Police Shootings | 12 | 7 | 4 | 8 | 11 | 12 | |
| Fresno per 1000 violent crimes | 3 | 2 | 1.3 | 2.9 | 3.75 | 3.95 | 2.82 |
| | | | | | | | |
| SACRAMENTO VIOLENT CRIMES | 5,265 | 5,556 | 5,128 | 4,660 | 4,165 | 4,109 | |
| Sacramento Police Shootings | 5 | 7 | 1 | 0 | 0 | 4 | |
| Sacramento per 1000 violent crimes | 1 | 1.25 | 0.2 | 0 | 0 | 1 | 0.58 |
| | | | | | | | |
| SAN JOSE VIOLENT CRIMES | 3,492 | 3,561 | 3,759 | 3,643 | 3,439 | 3,215 | |
| San Jose Police Shootings | 4 | 3 | 0 | 0 | 3 | 5 | |
| San Jose per 1000 violent crimes | 1.15 | 0.85 | 0 | 0 | 0.85 | 1.55 | 0.73 |

Footnotes:

Crime data from FBI Crime in the U.S. (CIUS) Reports, 2005-2010

* 2010 is preliminary data

As can be seen above, Fresno's rate of police shootings in comparison to violent crimes is nearly 4 times that of San Jose, and nearly 5 times that of Sacramento. Once again, what is demonstrated is the expected pattern of the FPD's acts and omissions with regard to police shootings: even when accounting for the variable of crime rates, more citizens will be shot by police due to an increased propensity to shoot and an increased number of unreasonable shootings.

## V.     QUALIFICATIONS

My opinions are based in part on my training, professional experience and education. I am a 27-year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and 15 years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18-month assignment as a staff jail deputy and two years as an Administrator/ Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to misdemeanor and felony crimes. They frequently required follow-up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers on these same methods.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST-accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993. Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnapping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of

police officers.  Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy-busts, and reverse stings.  We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations.  These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active homicide investigations.  In that regard, the unit processed under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects. Additionally, the majority of the 700 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents.  From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than 2,000 arrests of career criminals without a single shot fired—either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.

This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods and adherence to the moral and ethical standards endorsed by California POST and my department.  These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel."  This order remains in force today, without change, and includes the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert in both civil and criminal cases on police administration, police procedures, police tactics, police investigative procedures,

basic evidence evaluation and shooting scene reconstruction, jail procedures and jail administration, in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington.  I have also submitted written opinions in matters before Alaska, Georgia, Idaho, Louisiana, Montana, North Carolina, Oregon and Wyoming Federal and State Courts.

I have testified before the Los Angles Police Department Board of Rights and the Los Angeles County Civil Service Commission.  I have testified before the Harris County (Texas) Grand Jury.  I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California.  I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Accountability Project, National Lawyers Guild Convention, New Orleans, Louisiana.  I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project, and the Texas Civil Rights Project (Austin, Texas).  As a result of my expert testimony in Border Network, et al. v. Otero County, et al., Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden.  The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force.  Blankenhorn v. City of Orange, et al., 485 F.3d 463, 485 (9th Cir. 2007).  The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations.  Torres, et al v. City of Los Angeles, et al., 540 F.3d 1031, 1042-43 (9th Cir. 2008).  The Torres case was appealed to the U.S. Supreme Court and returned for trial.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.

I have been found competent by federal and state courts to render opinions as to the duties and responsibilities of police officers regarding their individual and collective responsibilities as occurred in this case.  A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

My fee schedule is attached as Exhibit A, my resume is attached as Exhibit B and a listing of my expert testimony on all matters for the past four years is attached to this report as Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 15, 2011.

Roger A. Clark